## STATE v. MIMS.

[ 61 Pac. 888.]

1. COMPETENCY OF EVIDENCE TO EXPLAIN IMPEACHMENT.—Where impeaching witnesses have given their version of a statement or conversation, it is competent to show by another person who was present that such witnesses had not correctly repeated what was said.

2. EVIDENCE SHOWING DANGEROUS CHARACTER OF DECEASED.—While it may be competent, as tending to justify the plea of self defense, to show the reputation or the character of deceased as a quarrelsome or dangerous person, that cannot be done by showing specific acts of violence toward other persons, or isolated acts not part of the res gestœ.

3. REBUTTAL — COMPETENCY OF EVIDENCE.—Where evidence had been introduced that deceased was in the habit of arming himself whenever he had a quarrel, it was competent in rebuttal to allow a witness to testify that, to the best of his knowledge, the deceased never carried arms.

4. Oᴘɪɴɪᴏɴ Eᴠɪᴅᴇɴᴄᴇ.—Where an eyewitness has minutely stated the details of an occurrence that is susceptible of an accurate description, the conclusions therefròm should be left to the jury; in such cases the opinions and deductions of the witnesses are not competent. Thus, where the details of an altercation had been described to the jury, showing the movements and positions of the respective parties from its inception until the fatal shot was fired, evidence as to who had the advantage in the fight was inadmissible.

5. Cᴏᴍᴍᴇɴᴛ ᴏɴ Tᴇsᴛɪᴍᴏɴʏ ᴏғ Uɴғʀɪᴇɴᴅʟʏ Wɪᴛɴᴇss.—Where a party calls a witness he will not be permitted to impeach his general reputation for truth, but he may argue that some parts of his testimony are not true, the rule against impeachment of one's own witness applying only to direct methods.

6. Rᴇᴍᴀʀᴋs ᴏғ Cᴏᴜɴsᴇʟ.—Where defendant was arrested soon after an affray for which he was on trial, the prosecuting attorney may comment on the fact that the officers and jail attendants were not called to substantiate defendant's claim that he had a large bump on his head, resulting from a blow by his opponent.

7. Iᴅᴇᴍ.—Where defendant shot the deceased in the latter's saloon during an encounter occasioned by a dispute over what a customer had said as to defendant cheating at the gambling table, remarks of counsel for the state in argument that the deceased had a right to protect his customers from those who cheated them were not improper.

8. Iᴅᴇᴍ—Cᴏᴍᴍᴇɴᴛ ᴏɴ Tᴇsᴛɪᴍᴏɴʏ.—Where defendant shot the deceased in a fight in the latter's saloon, and there was evidence that deceased on former occasions had removed persons from his saloon by taking them by the collar, a remark of counsel for the state in argument that it was his understanding that deceased took defendant by the collar to remove him from the room was a legitimate comment on the facts of the case.

9. Sʜᴏᴡɪɴɢ ᴀs ᴛᴏ Cᴏᴍᴘʀᴏᴍɪsᴇ Vᴇʀᴅɪᴄᴛ.—An affidavit of defendant that the verdict of the jury convicting him was the result of a compromise to save the county expenses, and that nine jurors were willing at any time to return a verdict of not guilty, and three of them refused to find a verdict of guilty unless a recommendation of extreme mercy was added to the verdict, unsupported by any of the jurors, and which did not show from what source the information concerning their secret deliberations was obtained, was not sufficient to justify a new trial.

10. Nᴇᴡ Tʀɪᴀʟ—Nᴇᴡʟʏ Dɪsᴄᴏᴠᴇʀᴇᴅ Eᴠɪᴅᴇɴᴄᴇ—Dɪsᴄʀᴇᴛɪᴏɴ.—Where defendant, who was convicted of manslaughter, was frequently visited at the jail just after the homicide by a proposed witness, an affidavit of the latter that he would swear that the deceased, a week before the homicide, threatened to kill defendant, and that he repeated the threat on the night of the homicide, but that affiant had not communicated such information to defendant until after the verdict had been returned, and an affidavit of defendant that he did not know of such testimony prior to the trial, are not sufficient to warrant a new trial because of newly discovered evidence, since it is not probable that such evidence would change the verdict, in view of the facts as detailed by eye witnesses, and the truthfulness of defendant's affidavit was suspicious.

From Umatilla :　Sᴛᴇᴘʜᴇɴ A. Lᴏᴡᴇʟʟ, Judge.

Edwin L. Mims appeals from a judgment of manslaughter.　　　　　　　　　　　　　　　　Aғғɪʀᴍᴇᴅ.

For appellant there was a brief over the names of *Carter & Raley* and *James A. Fee,* with an oral argument by *Mr. J. H. Raley* and *Mr. Fee.*

For the state there was a brief over the names of *Henry J. Bean,* District Attorney, *John McCourt,* Assistant Attorney-General, and *John J. Balleray,* with an oral argument by *Mr. Bean* and *Mr. Balleray.*

Mr. Justice Wolverton delivered the opinion.

The defendant appeals from a judgment rendered against him upon conviction of the crime of manslaughter upon an indictment for murder, wherein it is alleged that he killed one J. Henry Miller. The facts will sufficiently appear as the opinion proceeds.

1. In the course of the trial the state called Ed Rush as a witness, who testified, among other things, that in the latter part of May or the first of June preceding he was in Miller's saloon, that the deceased objected to Mims playing in his house, and that, as Mims was going out with some friends, he heard him say, "I will kill that son of a —— some time if he don't let me alone." For the purpose of impeachment the following question was propounded on cross-examination : "I will ask you if, in a conversation that occurred in John Basye's office about Wednesday, October 18, 1899, in the presence of John Basye, H. L. Scott, W. D. Blitch, I. N. Davis, and a farm hand of yours, if you did not in that conversation state and say, in conversing about the Mims case, that you were present in Miller's saloon, and that you heard Miller say that, if Mims did not stay out of there, that he would have to kill the son of a ——, or words to that effect?"— to which he answered, "No, sir." He was further interrogated as follows : "Q. Were you in that office at any other time about that time? A. No, sir. Q. You were there

for the purpose of settling a bill, were you not? A. Yes, sir." Subsequently the defense called Basye, Blitch, and Davis, whose evidence tended to show that Rush did make the statement imputed to him. John Beggy was called in rebuttal, and testified, substantially, that he lived in Pendleton, was a laborer engaged in farming and railroading, and was working for Rush at that time; that he recollected of being in the town of Helix on the day named in the impeaching question; that he went there with Rush, Basye, and a man from the warehouse, whom he afterwards recognized as Montgomery; that he stayed in Basye's office half an hour, when he went out into the store for about ten minutes, then returned again to the office, where he remained for something like three hours and a half, waiting for the train; and that the men referred to in the question were coming in and going out. He was then asked : "Did you hear Ed Rush, in that conversation, say that he had been down to Miller's saloon, here, and that he had heard Miller say that if the defendant here, Ed Mims, did not stay out of there, he would shoot the son of a ——? Did you hear Mr. Rush say anything like that?"—to which he answered : "I heard him say he heard Mims— Q. Heard Mims say? A. Heard Mims say that he would kill the son of a ——, Miller, the first chance he would get. That is all I heard then." He further testified that he heard no other conversation in which the language imputed to Rush was used. There was a motion to withdraw the testimony from the jury for the reason, among others, that it did not refer to the same conversation alluded to by the impeaching witnesses, which was denied, and the appellant complains of the ruling. The well settled rule of law that evidence intended to show that the witness has on other occasions made statements out of court similar to such as he has testified to in the case is not admissible in corroboration,

was invoked as fatal to the ruling. But we do not understand that this testimony was introduced for such purpose, but with the view of showing that the witnesses called to impeach Rush were mistaken in their interpretation of his language. It was shown very clearly that Beggy was the farm hand alluded to in the impeaching question put to Rush, which makes him competent to testify respecting the conversation, so as to counteract the statements of the impeaching witnesses.

2.   There was evidence introduced to the effect that the defendant was acting in self-defense when he shot the deceased, and, for the purpose of showing that he had reason for believing and fearing that the deceased would have killed him, if not resisted, or done him great bodily harm, he produced G. F. Stranahan to prove that he saw Miller have a difficulty in his saloon some two or three weeks previous to the encounter with Mims, and that Miller on that occasion armed himself with an ice pick and came out with the evident intention of settling the difficulty. The court refused to allow the testimony to go to the jury, and error is assigned. It was competent to show the reputation or the general character of the deceased as a quarrelsome, vindictive, or dangerous person ; but such reputation cannot be established by proving specific acts of violence towards third persons, or single, isolated, or unlawful acts forming no part of the res gestæ : Underhill, Cr. Ev. § 325 ; *Jenkins* v. *State*, 80 Md. 72 (30 Atl. 566); *Ryan* v. *State* (Tex. Cr. App.), 35 S. W. 288 ; *State* v. *Peffers*, 80 Iowa, 580 (46 N. W. 662); *Thomas* v. *People*, 67 N. Y. 218 ; *People* v. *Druse*, 103 N. Y. 655 (8 N. E. 733). The proffered evidence of Stranahan was of a particular act, and therefore obnoxious to the rule.

3.   Thomas Milarkey, a witness for the state, being called in rebuttal, was asked : "Can you tell the jury

whether or not he [Miller] was in the habit of arming himself on any occasion when he had any difficulty?''— to which he answered : ''I never saw him have any arms at all whatever. I don't think he carried any. I am positive he didn't.''. The court denied a motion to withdraw the answer, and error is predicated upon the ruling. Some evidence had gone to the jury to the effect that the deceased was in the habit of arming himself whenever he became involved in difficulty. The question was intended to counteract such evidence, and the answer was apparently responsive, so far as the witness' knowledge went. The character of the inquiry involved in some measure the reputation of the deceased as being a dangerous person when in dispute, and the answer had a bearing upon the issue, so there was no error in allowing it to stand.

4. The state called T. J. Means as a witness, who narrated the circumstances of the encounter which resulted in the death of Miller. On cross-examination he was asked : ''As a matter of fact, wasn't Mims as helpless as a child in that fight?''—to which he answered : ''I don't think he could fight with Miller.'' He was then asked : ''Did he stand any chance at all to get away from him or to protect himself at all any sooner than he did get away?'' which question the court would not permit him to answer. Later in the trial, Gus Holloway, also an eyewitness to the altercation, was called by the defendant and asked : ''Which one of the parties, up to the time that shot was fired, had the advantage in that fight?'' —and the court refused to allow the question to be answered. The ground of the objection to both questions was that they called for the opinion of the witness touching a matter about which the jury was as competent to judge as they. The witness Holloway had detailed the facts and circumstances from the inception of the alterca-

tion up to the time the fatal shot was fired, and had described minutely the movements and positions of the respective antagonists leading up to the result, which gave the jury equal facilities for judging as to who had the advantage in the quarrel as the witness. The incident was susceptible of accurate and perfect description in detail, and there was no occasion for opinion evidence such as was called for. The jurors were able to determine the question of advantage from the delineation of the attending circumstances, and it was within their peculiar province to do so, unaided by the opinion of the witness. So it was with the question propounded to Means. They were enabled to judge from a delineation of the circumstances attending the encounter up to that particular period of the incident whether Mims had any chance to get away sooner than he did, and the opinion of the witness was incompetent for their further advisement.

5.   One of the counsel for the state in his argument to the jury made use of the following language : ''We put Mr. Means upon the stand because we had to, but we don't claim that he told the truth,''—to which objection was taken, and an exception saved. The counsel continued : ''Gentlemen of the jury, you have a right to judge as to whose witness he [referring to Means] was, and who he was testifying for ;'' and, after further objection : ''I have a right to call your attention to the strenuous objection of Judge Fee to this statement of mine.'' The basis of the objection is that the statement of the counsel tended to the impeachment of the state's own witness. There were but two persons who witnessed the altercation from its inception to its termination. These were Means and Holloway. Cradick saw a good deal, but not all of it, and much that he did see was from a

36 Or.—21.

reflection in a mirror. The cross-examination of the witness Means developed a marked leaning towards the defendant, and much anxiety on his part to shield him from culpability. The argument of counsel was employed for the purpose of combating this particular feature of the case. Was it permissible? The rule of law is well established that a party producing a witness impliedly represents that he is worthy of belief, but this rule is applicable to preclude impeachment by direct methods alone; that is, the party producing the witness is not permitted to show that his reputation for truth and veracity is bad. The party may, however, put in proof any relevant fact which may have a tendency to establish his cause, and it matters not whether its effect is to corroborate, contradict, or impeach specific statements of any particular witness he may have produced. Thus, he may indirectly, if such is the tendency of the facts proven, impeach his own witness (Underhill, Cr. Ev. § 234); and whatever is legitimate in proof is also a legitimate subject for remark or discussion before the court or jury. If witnesses disagree in their narration of material facts, it is a proper subject of comment as to which of them told the truth and which of them did not, although they may have all been produced by the party indulging in the comment. This we understand to be the purpose and effect of the remarks complained of. It sometimes occurs that a party is compelled by the exigencies of the case to call an unfriendly witness for the establishment of a fact or facts that he cannot otherwise prove, but this does not necessarily preclude such party as to all the witness may testify to. He may yet prove independent facts, although the proof thereof may contradict in some measure independent statements of his own witness. Such was the contention of the state at the trial, as counsel insisted, and the

contention is not without relevancy, so that the remarks cannot be said to have operated injuriously to the defendant.

6. Other remarks of the counsel in his argument to the jury were excepted to, viz. : (1) ''Do you think that the deputy sheriff and everybody about the jail would not have seen that bump as big as a goose egg upon the head of the defendant, if it had been there?'' (2) ''While I am not inclined to applaud Mr. Miller for running the kind of a house he did, yet he had a right to defend his customers from those who gambled there for the purpose of cheating or defrauding his regular customers.'' And : (3) ''According to my understanding of it, Miller took Mims by the collar to remove him from the room.'' It is insisted that there was no evidence produced at the trial upon which to base the statement by way of inquiry, or either of the succeeding assertions. The inquiry was touching a physical fact which persons other than those called to prove it had ample facilities for observing. The fact that such persons were not also called was a proper subject for comment, and the allusion is to the inference which might reasonably have been drawn from the circumstance.

7. As it relates to the second remark, there is some testimony in the record tending to show that the defendant had not demeaned himself with suitable or proper circumspection or fairness at the gambling table. This is indicated, if by nothing else, by the dispute which took place between him and the deceased relative to what one of the customers of the place had said about not wanting to play with Mims, and which led directly to the physical encounter.

8. The latter remark was evidently induced by the testimony to the effect that Miller had taken two other men by the collar on former occasions and ejected them

from the saloon, and that it was inferable therefrom that
Miller was proceeding in a similar manner with the ac-
cused when he was shot.    It is often difficult to draw the
exact line of demarkation between the legitimate deduc-
tion from a fact and the statement of fact itself.    A state-
ment of a fact not proven, or of counsel's individual opin-
ion, should never be made or advanced before a jury;  but
all reasonable deduction or comment upon disputed facts
is legitimate argument, and unless there is absolute dis-
regard of professional propriety, to the prejudice of the
defendant, there will not be a reversal on account of it.
The argument, it seems to us, was a legitimate comment
upon the facts in the case.

9.    It is insisted that the verdict of the jury was the
result of a compromise which was influenced in a measure
by the action of the trial court.    The question is raised
by a motion for a new trial.    The jury was instructed
and retired at 5 o'clock in the evening of October 25, and
about 7 o'clock of the following evening went into court,
where, according to the defendant's sworn statement,
William Scott, the foreman, stated that they were unable
to agree ;  that the trial of the cause was very expensive ;
that he was willing to do anything in his power to arrive
at a verdict, but that he believed it would be impossible
for them to do so ;  that the court then stated to the jury
that if none of them were sick they would be required to
return to the jury room for further deliberation.    There-
upon two of the jurors signified their desire to be excused
from taking supper at the expense of the county, one of
them saying that he had been boarded at the expense of
the county long enough.    The defendant further stated,
upon information and belief, that nine of the jurors were
ready and willing at any time to return a verdict of not
guilty ;  that six voted, "Not guilty," from the first until
the compromise was reached whereby he was convicted ;

that three voted "Guilty," and refused to agree to a verdict unless the defendant should be convicted of manslaughter; that the other jurors insisted that, before they would consent to return such a verdict, there should be added a recommendation of extreme mercy; that the verdict returned was not the verdict of the jury, but that it was compelled thus to agree to save further expense to the county. The following was subjoined to the verdict: "We recommend the defendant to the extreme mercy of the court." The affidavit of the defendant constitutes the only evidence produced respecting the secret deliberations of the jury. None of the jurors came forward to sustain him in any particular, and it does not show from what source he derived his information. If such a showing, without other proof, were to prevail, as constituting just cause for setting aside the verdict of a jury, every person convicted of crime could easily prevent the entering of a judgment upon such conviction. There is nothing in the court's manner or treatment of the jury in sending it out the second time which would indicate a desire to influence it to agree merely because the trial had proven expensive. What the two jurors may have said touching the cost of the trial does not appear to have influenced the court, nor should it be considered as influencing the deliberations of the jury, and the form of the verdict is not of such a nature as to lead to the conclusion that it was the result of a compromise; so that the showing is not sufficient in this particular upon which to grant a new trial.

10. It is also insisted that the court below erred in refusing to grant a new trial because of newly discovered evidence material to the defense, as shown by the affidavits of the defendant and one William Lee. Lee avers that, if called as a witness, he would testify that he was in there about a week prior to the homicide, but that he

had been barred by Miller from gambling in his saloon, and that he asked Miller if he intended to allow Mims to continue to gamble therein; that he said he did not, and that he would kill the son of a —— if he did not remain away from there; that on the night of the twenty-third of August, a short time before the altercation, he went to the saloon, and, after he had passed a screen at the back entrance, he saw Miller standing at the slot machine; that Miller called him over and said, "You just watch the old man Miller lick that son of a —— if he steps in this house to-night," or words to that effect; that he had never disclosed these threats to Mims or his attorney prior to the trial. Mims' affidavit shows that he made especial effort to ascertain whether any threats had been made against him by Miller, but without avail, until after the trial. The state produced affidavits of the sheriff and his deputies, showing that Lee went to the jail two or three days after the arrest of the defendant, and was permitted to talk with him for the space of half an hour or more; that subsequently he continued to call, and was permitted to converse with the defendant four, five, or six times, all of which conversations were without the hearing of the affiants. In rebuttal, Mims deposed that he was suspicious of Lee, and, under the advice of his counsel, would not talk freely with him. There is much in the circumstance of the frequent visits of Lee with Mims, the first coming shortly after the altercation and being somewhat prolonged, to cast a shade of suspicion upon the truthfulness of the statement that the accused was not aware of the alleged newly discovered testimony until after the trial. The opportunity for inquiry upon the part of Mims and for disclosure on the part of Lee was certainly ample, and it may reasonably be inferred that their relations were friendly and confidential, rather than strained and reserved; but, however that

may be, the evidence proposed to be adduced is not of such nature that we can say the court below has abused its discretion by denying the motion. The alleged threats had never been communicated to the defendant, and, if they had been, they could have no other tendency than to show the state of the defendant's mind, and to relieve him from blame in case he might infer therefrom, and from the previous character of the deceased, his demeanor towards him, and his acts upon the occasion of the shooting, that he was in imminent danger of great bodily harm. There was evidence touching the altercation tending to show that following a heated discussion the deceased struck the accused violently with his left hand on the side of the head or neck and knocked him back against a screen standing near the front door of the saloon, and continued the assault, forcing him back into the corner and kicking him, whereupon the accused used his pistol in his defense. Now, if this testimony was not sufficient to induce the jury to believe the defendant shot the deceased under the conviction that he was about to take his life or do him great bodily injury, it is not probable that the additional testimony touching the previous uncommunicated threats to injure or kill the accused would be effective to change its verdict. "It must appear to the satisfaction of the court," says Mr. Underhill, "that, if a new trial is granted, it is reasonably probable that on the introduction of the new evidence the accused will be acquitted. * * * Mere relevancy alone is not sufficient to admit the evidence, if it is incredible, cumulative, unconvincing, or otherwise unsatisfactory :" Underhill, Cr. Ev. § 520. This is unlike the case of *Price* v. *State* (Tex. Cr. App.), 43 S. W. 96. There the difficulty between the deceased and the accused occurred when no eyewitness was present, and the vital question was, who began the difficulty, or who was the aggressor? It was

exceedingly important, therefore, to ascertain the feeling or illwill of the deceased toward the accused, so as to determine the probabilities respecting the matter, and whether the accused, in taking life, acted as a reasonable man would have done under like conditions. We are of the opinion that the court below exercised a reasonable discretion in denying a motion for retrial. These considerations affirm the judgment of the court below, and it is so ordered.        AFFIRMED.