Argued December 2, 1963, affirmed January 29, petition for
rehearing denied March 10, 1964

# STATE OF OREGON *v.* NICHOLS

388 P. 2d 739

*Edward N. Fadeley,* Eugene, argued the cause and filed briefs for appellant.

*William F. Frye,* District Attorney, Eugene, argued the cause and filed a brief for respondent.

Before McAllister, Chief Justice, and Rossman, Perry, Sloan, O'Connell, Goodwin and Denecke, Justices.

GOODWIN, J.

Defendant appeals from a conviction of second-degree murder.

The defendant took the stand and virtually admitted that he shot Hazel Nichols with a rifle and that she died as a result of the wound. He said the shooting was an accident. The prosecution contended that it was intentional, although without premeditation.

No witness, other than the defendant, saw the shooting. The defendant's teen-age daughter heard it. Her room was next to the room in which the shooting occurred. She also heard a verbal exchange which preceded the shot. She testified that her father and mother were having an argument that was sufficiently shrill to cause her to put her head under the covers in an effort to go to sleep. (The record does not disclose whether the defendant and the deceased were legally married.)

The testimony on both sides tended to prove that the defendant had intended to "go spotlight some deer." There was evidence that he was a competent marksman, and that within the year, using the weapon in evidence, he had killed eight deer with nine shots. He had the loaded rifle in his hands during the argument with the deceased. He did not remember firing it. There was some evidence that he had been drinking. The defendant argued that the weapon must have discharged while he was waving it around. The state argued that his story of an accidental shooting was implausible.

The case went to the jury on the charge of second-degree murder, as well as upon complete instructions that would have permitted the jury to return a verdict

of manslaughter, either voluntary or involuntary. The jury found the defendant guilty of second-degree murder. The sentence of life imprisonment was automatic. ORS 163.020 (4). There are eighteen assignments of error.

The first question arises out of the fact that the defendant previously had been indicted for the same killing. The first indictment had charged only the crime of manslaughter. A demurrer to that indictment was filed and overruled. Thereafter a trial was commenced. After listening for a day and a half to the state's evidence, the defendant objected to the introduction of any further evidence. This objection in effect renewed the contention of the original demurrer that the manslaughter indictment as drawn did not state a crime. The trial court heard argument. This time the court agreed that the indictment did not state a crime. The court then stopped the trial and dismissed the indictment with leave to the state to resubmit the matter to the grand jury. See ORS 135.670, 135.680, and 135.690. Upon resubmission, the grand jury concluded that the defendant ought to be charged with second-degree murder, and returned the present indictment accordingly.

In his first assignment of error the defendant says the state is bound by its first indictment. Upon resubmission of a criminal charge to the grand jury, he argues, that body may not, for the same conduct, indict the accused for a crime greater than it had charged in a former, defective indictment. Neither the defendant nor the state has cited authority upon the precise question.

We find in 1 Bishop, New Criminal Procedure 18, § 38 (2) (1913), this advice concerning the dilatory

pleas available to a defendant who has been indicted and faces trial:

"* * * [W]hen the grand jury has been dismissed, after their full term of service is ended, and there can be no fresh indictment except by another grand jury, something may be gained by causing the former to be abated. Perhaps a second grand jury will refuse a bill. Or, on the other hand, they may find one which will not be so easily answered as this, or which will subject the prisoner to a heavier punishment * * *."

█ We hold that where an indictment is dismissed and the matter is resubmitted to the grand jury the prosecution is in the same posture in which it would have been if the defendant had never been indicted. Such a defendant merely has been arrested and held to answer. In this case he has been held to answer for a homicide. Before a magistrate he has twice been "bound over" to the grand jury. The defendant has not been convicted or acquitted. The grand jury is free, therefore, within the limitations of the statutes setting forth its duties, to indict for any crime of which it believes the accused to be guilty. See ORS 132.380.

An illustration will explain the proper application of the statutes which permit resubmission of criminal matters to grand juries. Suppose an accused has been arrested for an assault with a dangerous weapon, bound over, and in due course indicted by the grand jury for that crime. The indictment is believed to contain some defect. If the defendant successfully demurs to the indictment and the matter is resubmitted, the grand jury is again free to consider all the evidence it considered the first time. Joyce, Indictments 155-156, § 130 (2d ed 1924). No reason has

been suggested why it may not also consider such other evidence as subsequently may have been uncovered by the state. See *State v. Reinhart,* 26 Or 466, 473, 38 P 822 (1895). Thus, if the victim of the assault meanwhile should die of the wounds received therein, that fact would be relevant while the case is before the second grand jury. The fact that the first grand jury had indicted the accused only for an assault should not deny the later grand jury the power to indict for a greater offense.

■ The result should be the same whether the matter is before the grand jury for reconsideration under an order of the court given at the instance of the state or upon motion of the defendant. A grand jury properly having a matter before it should be free to indict for any crime that has been committed, and in whatever degree the evidence will warrant. See *State v. Teague,* 215 Or 609, 610, 336 P2d 338 (1959).

■ A defendant so indicted has not been in prior jeopardy, because the first indictment, by his own admission, charged no crime. See cases noted in Annotation, 63 ALR2d 782, 797 (1959). He cannot complain, therefore, if a second indictment charges a more serious crime than the first one attempted to charge, provided, of course, that the evidence in the hands of the state would warrant such a charge. Any other rule would make of the grand jury nothing more than a solemnly constituted, seven-member rubber stamp. *State v. Reinhart,* supra at 473.

In *State v. Fowler,* 225 Or 201, 203, 357 P2d 279 (1960), there had been a trial. After a verdict, there was a motion in arrest of judgment based upon a faulty indictment. There the court said:

"ORS 136.820 provides that * * * '[t]he effect of allowing a motion in arrest of judgment

is to place the defendant in the same situation in which he was before indictment was found.' And ORS 136.830 gives the trial court the power to re-submit the case to the grand jury if the court believes there is 'reasonable ground' to believe the defendant guilty and that a 'new indictment can be framed upon which he may be convicted, * * *.' "

*A fortiori,* in a case like the one now before us, where the facts alleged in the first indictment have never been tried by a jury, the defendant's status as an accused when the first indictment is held to be defective should be the same as it was before he was indicted.

The defendant relies upon an analogy drawn from cases like *State v. Steeves,* 29 Or 85, 43 P 947 (1896). Such cases hold that after a conviction which, upon appeal, is reversed for error, the state may not, upon a new trial, submit to the jury a choice of verdicts within which the defendant could be found guilty of a greater crime or degree of crime than the one of which he was formerly, though erroneously, convicted. The reason for the rule in such a case is that a jury has, in finding the defendant guilty of a specific degree of crime, found him in effect not guilty of all the greater degrees of the crime that were included or includable in the acts described in the first indictment. In the case at bar, there has been no former trial upon a valid indictment and no verdict has been found.

The question does not involve double jeopardy, but rather it involves a question of fair treatment. Should a defendant who challenges a defective indictment be allowed to do so only upon assuming the risk that if his point is well taken he may be later rewarded

by a new indictment which charges a more serious crime? We believe the question requires an affirmative answer. There is nothing fundamentally unfair about permitting the state in a criminal case to make the best case it can when the matter is placed at large by the defendant's demurrer to an indictment. If the defendant is guilty of a greater crime than was at first believed, it is the state's duty to prosecute him for it.

In civil litigation the rule is well established that an amended pleading may be filed with leave of the court after a demurrer has been sustained. It is no surprise to defendants in civil litigation to find that their demurrers frequently have educated their adversaries and have produced amended pleadings that are more difficult to defend than were those demurred against. Except where some reason exists for a different rule, the same rules should apply in criminal as in civil cases. We recognize that there is a body of state and federal decisions, primarily in capital cases, holding that one *convicted* of first-degree murder and sentenced to life in prison should not, upon a new trial, be forced to run the risk of the death penalty. See, e.g., *People v. Henderson,* 35 Cal Rptr 77, 386 P2d 677 (1963). But such cases are based upon a judicial reluctance to see the price of an appeal set at the risk of a man's life. While their rationale may have some merit in weighing the policy of liberal appeal in capital cases, we believe it would be a backward step toward the sporting theory of justice to treat a demurrer as the equivalent of an appeal and thereby to hold that the state's hands are forever tied by the first indictment to come out of a grand jury. Such a theory is inconsistent with our statutes concerning the work of the grand jury, and is not demanded by any fundamental consideration of fair play. There was no error

in proceeding with the prosecution on the new indictment.

The second assignment of error presents the question whether there was prejudicial error in permitting the jury to hear the defendant's daughter recount, on the witness stand, how she had reacted to the shooting. The evidence was to the effect that when she heard the shot she hurried to the bedroom where the shooting occurred. The district attorney then asked her what she had said to her father when she saw the body on the bed. The question was not objected to. She answered: "I called him a murderer!"

We have been given no authority for the proposition that the state may bring in, under the guise of a spontaneous declaration, the reaction of a bystander to an event which the bystander overheard. Counsel on both sides, in their briefs and arguments, make sweeping references to "the *res gestae* rule" and the supposed mystical properties of "spontaneous utterances."

There are, of course spontaneous utterances that have evidentiary value. One kind of spontaneous utterance that may have probative value is that of the victim of a crime, made immediately to a third person who was not a witness, and then by that third person testimonially reported to the jury. This is a true exception to the hearsay rule. *State v. Hutchison,* 222 Or 533, 353 P2d 1047, 83 ALR2d 1361 (1960). A second kind of spontaneous utterance is that made by a witness to the event. This may or may not involve hearsay. The utterance in some circumstances may be reported to the jury by another bystander who also witnessed all or part of the event. If probative of an issue in the case, such an utterance as "He's killed Ma!" can be relayed to the jury as part of the total

transaction being described by the person testifying. *State v. Davis,* 70 Or 93, 97, 140 P 448 (1914). Still a third kind of utterance is only colorably "spontaneous", if that is a correct use of the term. A typical such case is one where a bystander sees an event, and then after an interval tells someone who was not a witness what he has seen. If the third party then comes into court as a witness and testifies to the statement made to him by the bystander, such testimony is hornbook hearsay unless it can qualify as a part of the disputed transaction. To qualify it must be so nearly like the truly "spontaneous" utterance found in *State v. Davis,* supra, as to come under the so-called *res gestae* rule and thus not be hearsay at all. The test of its admissibility is usually its proximity to the event and the excitement thereof. See *State v. Herrera,* 236 Or 1, 386 P2d 448 (1963).

■ Now, in the case at bar, we have still another variety of a report to the jury of something said by a bystander. Again, the problem has nothing to do with hearsay. This time it is the bystander herself who is on the witness stand. She is now being asked to tell the jury not only what she saw and heard but also what she said at the time she saw or heard something. What she said, unless it had some operative relationship to what happened, is irrelevant. ORS 44.060; *State v. Mims,* 36 Or 315, 320-321, 61 P 888 (1900).

■ A commonly misunderstood variation upon such bystander testimony is the report of a so-called assent by silence in the face of an accusatory declaration. *State v. LaPlant,* 149 Or 615, 623-624, 42 P2d 158 (1935); but see ORS 136.540 (2). See also 4 Wigmore, Evidence 70, § 1071 (3d ed 1940), and Note, 29 NYUL

Rev 1266 (1954). Since the state has not attempted to justify the testimony now before us on that score we need not consider it further. In the case at bar, an earlier statement made by the witness tends to prove no fact in issue. It is irrelevant as the mere conclusion the bystander happened to draw from the events observed.

However, the record shows that when defense counsel failed to object to the question that was employed to elicit the challenged answer, he knew from the previous trial what the answer was going to be. Instead of objecting to the question, counsel waited for the answer to come in and then moved for a mistrial.

■ The refusal of the trial court upon request to tell the jury to disregard the answer and the refusal to grant a mistrial are both assigned as error. The refusal to tell the jury to disregard the answer was not an error under the circumstances. See *Savage Adm'x v. Palmer et al,* 204 Or 257, 274, 280 P2d 982 (1955).

The third assignment of error challenges the failure of the trial court to grant a mistrial for the reasons urged in support of the second assignment. It is without merit. *Denham et ux v. Cuddeback,* 210 Or 485, 493, 311 P2d 1014 (1957).

The fourth assignment of error asserts that the defendant was denied a fair trial because his counsel was not permitted to perform certain experiments in the courtroom. The deceased was found lying on a bed. The bullet which killed her had entered her face under the left eye and had emerged in the vicinity of the left ear, carrying with it large amounts of bone and soft tissue. The bullet had then pierced the mattress. A portion of a copper jacket which surrounded the lead body of the projectile was found on

the floor under the bed. A fragment of lead, or "slug", was found in the mattress.

Police officers had testified, in the state's case-in-chief, concerning the location of the body on the bed, the location of the bullet holes, and various measurements made during the investigation. From all this testimony, the state was prepared to, and eventually did, argue that the fatal bullet had been fired from a weapon held at shoulder height. The state sought thereby to strengthen an inference that the fatal shot was an aimed shot rather than merely an unfortunate coincidence.

During the defendant's case, the bed was brought into court. Counsel, while depressing the springs with his hands, questioned a police officer. When the prosecutor protested, counsel indicated that he intended to demonstrate the extent to which the springs might be depressed by greater amounts of weight, such as that of a human body. At this point, the state's objection was sustained. The defendant now contends that the trial court denied him the right to present his theory of the case to the jury.

██ The contention is without merit. The nature and scope of demonstrations to be permitted in the courtroom is ordinarily a matter to be controlled within the discretion of the trial judge. See *State v. Smith,* 228 Or 340, 344, 364 P2d 786 (1961). Only where there is a manifest abuse of discretion will this court substitute its judgment for that of the trial judge. *State v. Sack,* 210 Or 552, 580, 300 P2d 427 (1956), appeal dismissed, 353 US 962, 77 S Ct 1048, 1 L Ed2d 912 (1957). Here there is no reason to say the court abused its discretion. Counsel was permitted to make his point. If any juror previously had not shared in the common knowledge that bed springs may be depressed

to some extent when a bed is occupied, counsel had made that fact known and could dwell upon it (and did) at length in his final argument. We cannot say, as a matter of law, that in cutting short the experiments with the bed the court denied the defendant any substantial right.

The fifth assignment of error presents substantially the same question as did the fourth, and is equally without merit.

The sixth assignment of error is a quibble with the trial court's instruction concerning the deliberate use of a deadly weapon. (An intent to murder is presumed from the deliberate use of a deadly weapon causing death within one year.) This is an accurate statement of the law, although care should be taken, as it was in the case at bar, not to tell the jury that the presumption is conclusive. See, e.g., *State of Oregon v. Nodine,* 198 Or 679, 695, 259 P2d 1056 (1953). The defendant says the court should have defined the word "deliberate" for the jury. We think the word was understandable without elaboration in the context in which it was used.

The seventh assignment of error concerns an offer of proof that was rejected. The defendant called the district attorney as a witness and attempted to force him to admit that during oral argument concerning the sufficiency of the first indictment he had said to the court, "The State cannot honestly say that this defendant aimed that rifle at his wife and pulled the trigger intending to kill her."

The defendant contends that the foregoing quotation was proper evidence under the rule which allows evidence of "judicial" admissions to be received in subsequent proceedings. The state, on the contrary, says that the opinions of law enforcement officers

formed on the basis of whatever evidence they may have had when they expressed the opinions are not binding upon the state in future prosecutions.

The correct rule is stated in *People v. Kinder,* 122 Cal App2d 457, 265 P2d 24, 28 (1954): "* * * The mere argument of counsel is not evidence and is not admissible as such unless made as a factual admission * * * and entered in the course of a trial." The opinion expressed by the attorney during the earlier proceeding while arguing a matter of law was no more relevant to prove the facts in the subsequent trial than it would have been if the attorney instead had expressed his enthusiastic personal belief in the guilt of the accused and the state were trying to place that opinion before the jury.

The eighth and ninth assignments of error challenge the rulings of the trial court which permitted the prosecution to persist in questioning witnesses about irrelevant matters after the defendant had objected and after the objections had been sustained. The record reveals a number of efforts by the prosecution to place before the jury irrelevancies concerning the life and habits of the defendant. Some of this evidence was not complimentary to the defendant. The defendant now says he was forced to make a number of objections. He was. We cannot say, however, that the prosecution's inability to separate the wheat from the chaff amounted to a studied attempt to prejudice the defendant. There was no misconduct of sufficient gravity to require another trial.

When it appears that the prosecution has embarked upon a calculated course of forcing the defendant to object to irrelevant evidence for the sole purpose of making the jury think the defendant is trying to keep it from learning the facts, a trial court ordinarily

will take effective action to see that the defendant has a fair trial. If the trial court fails properly to preside over the trial, review is, of course, available. See *State v. Sing,* 114 Or 267, 278, 229 P 921 (1925). The record in the case before us, however, does not indicate that the irrelevancies indulged in by the state amounted to conduct so reprehensible as to require reversal. The most that can be said for the defendant's proposition is that the state may have ranged further afield than was necessary in some particulars. These excursions wasted the court's time. The court could have put a stop to the waste of time. The irrelevancies that actually got before the jury, however, were not likely to harm the defendant. See *State v. Dennis,* 177 Or 73, 123, 132, 159 P2d 838, 161 P2d 670 (1945).

At one point, for example, the prosecution attempted to get before the jury the name of a woman with whom the defendant's association might have been questionable if the defendant was a married man. (Both sides conspicuously refrained from disclosing whether the defendant and the deceased were husband and wife.) The evidence about another woman was wholly irrelevant as the case then stood. It was objected to and the objection was sustained. Since there was no contention that the defendant was married, there was neither relevancy nor prejudice in the offer. Such evidence would not have helped the defendant's case, however, as a practical matter. The state seemed eager to bring it in, and the defendant seemed equally eager to keep it out. The byplay of counsel on the point perhaps dramatized the irrelevancy in the eyes of the jury, but that problem could have been avoided by a prompt ruling. If the court had any doubt, the matter could have been dis-

posed of during a recess. Both counsel knew what the fencing was all about. The irrelevancies in any event did not approach the prejudicial nature of those found in such cases as *State v. Flett*, 234 Or 124, 380 P2d 634 (1963). We conclude that there was no ground for a mistrial.

The tenth, eleventh and twelfth assignments of error relate to the propriety of certain arguments made by the district attorney to the effect that the state had not been permitted to interview the defendant's children or that obstacles had been placed in the way of the prosecution in attempts to interview them prior to trial.

Except for the defendant's oldest daughter, who was a somewhat reluctant witness for the state, no other child testified. One of the state's attorneys in rebuttal argument fell into the error of "testifying" that the state had not called the other children as witnesses, saying, in effect, that they had been with their father or his family and that they had not been interviewed by the prosecution. The court, upon objection, stopped this kind of argument. The defendant made a motion for a mistrial. The motion was denied. There is nothing in the record, however, to suggest how prejudice could have entered the case at this point.

The impropriety in the prosecution's rebuttal statement lay in its testimonial character, not in any serious harm to the defendant. The court did not abuse its discretion when it refused to declare a mistrial. Counsel for a defendant should be diligent to protect his client's rights, but due diligence does not demand that a mistrial be invoked at every possible point in the trial where there is a difference of opinion between counsel.

■ The thirteenth and fourteenth assignments of error again demonstrate more the diligence of counsel than error on the part of the court.

While the defendant was on the stand, the district attorney handed him a rifle in connection with his cross examination. The rifle remained in the witness box, partially visible, no doubt, to the jury. The defendant thereafter moved again for a mistrial, claiming that he had been prejudiced because the state had employed the rifle as a prop for the purpose of creating an unfavorable "image" of the defendant in the minds of the jurors. For the purposes of these contentions that the trial court abused its discretion, it may be assumed that the district attorney did contrive so to set the stage in order to injure the defendant. There was, however, nothing to prevent counsel for the defense asking the bailiff to remove the offending exhibit when it had served whatever legitimate purpose it may have had.

The defendant had virtually admitted on the stand that he had killed a woman with the rifle. That fact was not a vital issue in the case. The only real issue was whether the rifle had been fired intentionally or accidentally. On that issue, the presence of the rifle in or near the witness box could have had but slight effect, if any, upon the jury's thinking one way or the other. There was no showing of prejudice.

The fifteenth assignment of error charges the district attorney with deliberately misquoting testimony in his final argument to the jury. We have examined the argument, the testimony, and the defense objection with care, and have found nothing that even approaches deliberate misstatement.

■ The sixteenth assignment of error has something to be said for it, but it presents insufficient

grounds for reversal. During the direct examination of the defendant's teen-age daughter by the state, she appeared to be extremely reluctant to tell the jury the kind of story the prosecution thought she should tell. She was, accordingly, subjected to many leading questions. Ordinarily leading is not permitted on direct examination. ORS 45.560. Since the state had not claimed surprise or otherwise shown her to be a hostile witness, leading the witness was technically improper. See *State v. Ogden,* 39 Or 195, 202, 65 P 449 (1901).

 It was even more improper to proceed, as the prosecution was allowed to do, with a series of questions of a more or less impeaching character. ORS 45.590. *State v. Merlo,* 92 Or 678, 699, 173 P 317, 182 P 153 (1919). The improprieties were all objected to and the objections were erroneously overruled. It does not follow, however, that the errors thus committed were so prejudicial as to require another trial.

 The deputy district attorney kept reading from his notes of testimony given by the witness before the grand jury and asking the witness if she had so testified. The procedure was contrary to ORS 45.610, which requires that such writings be submitted to the witness. The evidence that was thus manufactured by the state was nothing more than the "testimony" of the attorney who was conducting the examination. If this performance had contained prejudicial matter, the error might have been reversible. The testimony was, however, relatively innocuous. The net result of the episode tended to prove that the girl had heard a quarrel the night of the shooting, and that she did not want to talk about it. The entire exchange should have been stricken on the spot and the jury should have been told to disregard it. At the end of the trial the jury was so instructed. The error, therefore, was

purely technical, was in large measure cured, and in any event constitutes no basis for reversal. See ORS 138.230.

■ The seventeenth assignment of error asserts that it was prejudicial to the defendant to submit to the jury the written form of the indictment, which bore, as required by law, the names of all the witnesses who had appeared before the grand jury. Some of these witnesses had not been called to testify during the trial.

The assignment is obscure, if not, indeed, frivolous. The jury was properly instructed concerning the indictment and its office in the prosecution. There is no showing that the defendant was prejudiced in any way.

■ The eighteenth assignment of error challenges the failure of the court to direct a verdict of acquittal. It shows that the defendant was stoutly defended to the end, but reveals no error. The case was one for the jury.

We have, perhaps, devoted to the foregoing assignments of error more attention than some of them deserve, but the case is one of importance to the defendant. We are satisfied that he had a fair trial, and that whatever minor irregularities may have crept into the proceedings were the result of good-faith advocacy on both sides. No error was, of itself, sufficient to justify another trial. Neither was the cumulative effect of the minor irregularities sufficient to deprive the defendant of a fair trial. Nothing that happened during the trial resulted in substantial prejudice to the defendant.

Affirmed.