154 April 24, 2024 No. 258

IN THE COURT OF APPEALS OF THE
STATE OF OREGON

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

ANTHONY ALAN WORSHAM,
*Defendant-Appellant.*

Douglas County Circuit Court
21CR46056; A178554

Ann Marie Simmons, Judge.

Argued and submitted February 7, 2024.

Stacy M. Du Clos, Deputy Public Defender, argued the cause for appellant. Also on the briefs was Ernest G. Lannet, Chief Defender, Criminal Appellate Section, Office of Public Defense Services.

Jennifer S. Lloyd, Assistant Attorney General, argued the cause for respondent. On the brief were Ellen F. Rosenblum, Attorney General, Benjamin Gutman, Solicitor General, and Patricia G. Rincon, Assistant Attorney General.

Before Aoyagi, Presiding Judge, Joyce, Judge, and Jacquot, Judge.

AOYAGI, P. J.

Reversed and remanded.

**AOYAGI, P. J.**

Defendant was convicted of second-degree assault based on an incident in which he stabbed C with a pocket-knife. The issue on appeal pertains to the "initial aggressor" limitation on self-defense. After defendant raised the defense of self-defense, the state sought to disprove self-defense, including by arguing that defendant was the initial aggressor. *See* ORS 161.215(1)(b) ("[A] person is not justified in using physical force upon another person if * * * [t]he person is the initial aggressor[.]").[1] The jury ultimately rejected the defense and found defendant guilty. On appeal, in an unpreserved claim of error, defendant argues that the trial court plainly erred by failing to instruct the jury on the meaning of "initial aggressor." For the reasons discussed below, we agree that it was plain error in this case not to instruct on the meaning of "initial aggressor," that the error was not harmless, and that the circumstances merit the exercise of our discretion to correct the error. Accordingly, we reverse and remand for a new trial.[2]

## FACTS

We describe the evidence "in the light most favorable to the establishment of the facts necessary to require the instruction." *Ossanna v. Nike, Inc.*, 365 Or 196, 199, 445 P3d 281 (2019). That is, we describe it in the light most favorable to defendant having acted in self-defense and having not been the initial aggressor.

On August 31, 2021, defendant was living in a tent in a park in Roseburg. The complainant, C, and his girlfriend, B, were living in a parked vehicle in the area. C and B had been arguing loudly for days. Around midnight, B left the vehicle and walked to the park to purchase drugs, and C, who had used methamphetamine that evening, followed her. When C caught up to B in the park, the two yelled "bad

---

[1] An exception to the initial-aggressor limitation applies when the initial aggressor "withdraws from the encounter and effectively communicates to the other person the intent to do so, but the latter nevertheless continues or threatens to continue the use of unlawful physical force." ORS 161.215(1)(b). That exception is not at issue on appeal and is not relevant to our analysis, so we do not discuss it.

[2] Given our disposition, we do not discuss defendant's second assignment of error.

words" at each other for "a good 15 minutes," and B ended up on the ground.[3]

From inside his tent, defendant heard C and B pass by, their arguing, a big slap, then B yelling for someone to help her and for C to get off her. Defendant decided to "step in and go help." Having been assaulted by people in the past, he took his pocketknife (which had a three-inch blade) for protection and held it near his thigh, open and pointing outward, as he walked. When defendant was approximately 20 to 30 feet from C and B's perceived location, defendant yelled at C to stop beating on a woman. C walked toward defendant. In the "pitch black" darkness, they did not see each other until they were practically face to face and bumped into one another on the trail. C—who did not realize that defendant was holding a knife—swung four times at defendant (making contact once), then charged at defendant's waist as if to wrestle him to the ground. Defendant braced in response, and, when C charged, C impaled himself on the knife, although neither man immediately realized it. C backed up and kicked defendant in the ribs. C then touched his shirt, realized he was bleeding, and said, "[Y]ou fucking stabbed me."

Defendant returned to his tent and called 9-1-1. Defendant told the 9-1-1 operator that someone had run into his knife while attacking him. In an interview at the hospital, C told the police that the fight was prompted by defendant saying something like "you shouldn't hit a woman." Defendant was interviewed at the police station over a nine-hour period; he maintained that he never intended to stab C, that he carried the knife only for protection, and that C had impaled himself while trying to assault defendant.

Defendant was charged with first-degree assault, ORS 163.185, and unlawful use of a weapon, ORS 166.220. Before trial, he gave notice that he claimed self-defense, thus triggering the state's burden to disprove self-defense. At trial, the state sought to disprove self-defense by, among

---

[3] According to B, she threw herself to the ground (testimony on direct) or defendant pushed her to the ground (testimony on cross). According to C, he "hugged" B, causing them both "to lie down and look at the stars" to try to "calm down."

other things, proving that defendant was the initial aggressor. (The state also made arguments about provocation and mutual combat.)

After both parties rested, and before closing arguments, the court instructed the jury. As relevant here, the court gave instructions on the elements of assault, the defense of self-defense, and limitations on self-defense, including that the defense is not available to the "initial aggressor." The court gave no instructions as to what it means to be the "initial aggressor."

In closing argument, the prosecutor addressed the initial-aggressor limitation on self-defense, arguing that it did not necessarily require "physical" aggression and that it was up to the jury to decide what an "aggressor" is:

> "Well, then you have to look who is the initial aggressor. And it doesn't have to be one or the other but who is the initial aggressor in this, right? And look in here. It doesn't say physically aggressive. It's aggressor. It's open. It's open to your determination.
>
> "A person is not justified in using physical force on another person if he was the initial aggressor. What did [the complainant] say to [defendant]? What did [the complainant] know about [defendant] at that moment? Nothing. He had no idea he was even there."

A moment later, while transitioning into the separate issue of deadly force, the prosecutor reiterated his broad view of what an "initial aggressor" is, stating, "Then we move to limitations on the use of deadly physical force. Let's say you get there and you say oh, no. [Defendant], he wasn't the initial aggressor. He didn't provoke anything. He's just minding his own business and look what happens, right."

In the defense's closing argument, defense counsel disputed that defendant was the initial aggressor. He argued that C brought the force to defendant by charging defendant, which resulted in an injury because defendant was carrying a knife for protection at the time.

In rebuttal, the prosecutor focused on the limitations on self-defense. He argued that, although "[t]here are situations where you could walk up to something [*sic*] and

say something in a certain manner and it might not be provocation or you may not be the initial aggressor," here defendant walked up "yelling in [C's] face stop beating on women." The prosecutor continued, "In this, in this situation one thing is gonna happen. And everyone in this courtroom knows it, including [defendant]. But he did that. He walked into that. He created the situation. He was the one in control." The prosecutor continued on the theme of control, then concluded by stating, "He has a duty, injecting himself, not to provoke or be the initial aggressor which he clearly does. That removes his ability for self-defense." The prosecutor asked the jury to find defendant guilty.

The jury found defendant guilty of second-degree assault, as a lesser included offense of first-degree assault, and unlawful use of a weapon. The two verdicts merged into a single conviction for second-degree assault.

## ANALYSIS

Defendant contends that the trial court erred by failing to instruct the jury on the meaning of "initial aggressor" as relevant to self-defense. He acknowledges that he did not preserve his claim of error and that we are therefore limited to plain-error review. *See State v. Wyatt*, 331 Or 335, 341, 15 P3d 22 (2000) ("Generally, an issue not preserved in the trial court will not be considered on appeal."); ORAP 5.45(1) (allowing discretionary review of "plain" errors). An error is "plain" when it is an error of law, the legal point is obvious and not reasonably in dispute, and the error is apparent on the record without having to choose among competing inferences. *State v. Vanornum*, 354 Or 614, 629, 317 P3d 889 (2013). It is a matter of discretion whether we will correct a plain error. *State v. Gornick*, 340 Or 160, 166, 130 P3d 780 (2006). We must use "utmost caution" in exercising that discretion, given the strong policy reasons favoring preservation. *Ailes v. Portland Meadows, Inc.*, 312 Or 376, 382, 823 P2d 956 (1991).

"Initial aggressor" is a legal term of art. *State v. Phillips*, 313 Or App 1, 5, 493 P3d 548, *rev den*, 368 Or 788 (2021) ("The term 'aggressor' has long been a legal term of art used within the criminal defense of self-defense."). Although

the term is not statutorily defined, it is well-established that "provocation by mere words, if unaccompanied by any overt act of hostility," does not make a person the initial aggressor. *Penn v. Henderson*, 174 Or 1, 14, 146 P2d 760 (1944); *see also Phillips*, 313 Or App at 6 (same). Overt acts of hostility may include, for example, slapping or striking a person, *Silfast v. Matheny*, 171 Or 1, 10, 136 P2d 260 (1943), or spitting in a person's face, *Phillips*, 313 Or App at 7.

The legal meaning of "initial aggressor" is thus narrower than the common definition. *See, e.g.*, *Webster's Third New Int'l Dictionary* 41 (unabridged ed 2002) (defining "aggression" as "an offensive action or procedure," especially—but not only—"a culpable unprovoked overt hostile attack"); *Merriam-Webster Unabridged Dictionary*, https://www.merriam-webster.com/dictionary/aggression (accessed on Apr 8, 2024) (defining "aggression" as "a forceful action or procedure (such as an unprovoked attack) especially when intended to dominate or master"). It is also significantly narrower than modern common usage. *See, e.g.*, *Wikipedia*, https://en.wikipedia.org/wiki/Aggression (accessed on Apr 8, 2024) ("Aggression is a behavior aimed at opposing or attacking something or someone. *** In definitions commonly used in the social sciences and behavioral sciences, aggression is an action or response by an individual that delivers something unpleasant to another person. *** Aggression can take a variety of forms, which may be expressed physically, or communicated verbally or non-verbally[.]"); *Dictionary.com*, https://www.dictionary.com/browse/aggression (accessed on Apr 8, 2024) (defining "aggression" as "any offensive action, attack, or procedure").

Relying on *Penn* and *Phillips*, defendant contends that, for self-defense purposes, the "initial aggressor" in an altercation is the person who first employs hostile physical force or threatens to imminently do so, that mere words are insufficient without an accompanying overt act of hostility, and that it was plain error not to instruct the jury on the meaning of "initial aggressor." In response, the state concurs that "mere words" do not make someone the initial aggressor, but argues that physical "force" is not required (pointing to *Phillips*, 313 Or App at 5-6, as involving spitting, an "act

of hostility \* \* \* that also involves physical contact," even if not "force"), and asserts that it is not obvious and is reasonably in dispute that the jury needed an instruction on the meaning of "initial aggressor." In the state's view, "[e]ven assuming that the term 'initial aggressor' was an essential term, jurors likely had a common understanding about what it means to be an 'initial aggressor' that was sufficient to permit the jury to reach a lawful verdict."

As an initial matter, we note that, to the extent that the jury needed to be instructed on the meaning of "initial aggressor," it was the state that should have requested the instruction, as the party bearing the burden of proof. *See State v. Brown*, 327 Or App 592, 598-99, 536 P3d 1069 (2023) ("[B]ecause it is the state's obligation—not a defendant's—to disprove self-defense and to ask for an instruction on the limitation to self-defense, and because a jury must be instructed on all matters of law necessary for its verdict, a prosecutor who invokes the exception must concomitantly seek the corresponding jury instruction."); *State v. Freeman*, 109 Or App 472, 476, 820 P2d 37 (1991) ("A defendant has no burden to disprove the limitations [to self-defense] and, consequently, no burden to submit instructions on them."). The state's arguments faulting defendant for not requesting an instruction and seeking to put the onus on him to come up with the exact words for an instruction are therefore misplaced. Defendant's failure to object at trial means that our review is limited to plain error. However, it was the state, not defendant, that was actually responsible for requesting any necessary instructions on the limitations on self-defense.

We now turn to whether an instruction on the meaning of "initial aggressor" was necessary in this case.

A trial court is required to "state to the jury all matters of law necessary for its information in giving its verdict." ORCP 59 B; *see* ORS 136.330(1) (making ORCP 59 B applicable to criminal cases). Moreover, "[a] party is generally entitled to have the court instruct a jury on a legal principle if there is evidence to support it and the proposed instruction accurately states the law." *State v. McNally*, 272 Or App 201, 207, 353 P3d 1255 (2015), *rev'd on other*

*grounds*, 361 Or 314, 392 P3d 721 (2017). "Generally, words of common usage need not be defined for the jury." *State v. McDonnell*, 313 Or 478, 497, 837 P2d 941 (1992). When a term's legal meaning differs from common usage, however, an instruction may be necessary. *Compare State v. Nichols*, 236 Or 521, 535, 388 P2d 739 (1964) (holding that it was not error to decline to instruct the jury on the meaning of "deliberate," where its meaning was "understandable without elaboration in the context in which it was used"), *with Purdy v. Deere & Co./Norton*, 311 Or App 244, 265-66, 492 P3d 99, *rev den*, 369 Or 110 (2021) (holding that it was error not to give a requested instruction on the meaning of "adequate warning," where the legal meaning of that term included an objective component that was "not necessarily encompassed within the common meaning of the term"), *and State v. Roberts*, 293 Or App 340, 347-48, 427 P3d 1130 (2018) (holding that it was error not to instruct the jury on the meaning of "substantial pain," where the legal meaning of that term contained a durational component that was not part of its common meaning and would not be apparent to a juror without instruction).

Here, had the state requested an instruction on the meaning of "initial aggressor," or had defendant objected to the lack of such an instruction, we would readily conclude on this record that the court erred in failing to give an instruction. That is not the question before us though. The question here is whether it was *plain error* not to instruct the jury on the meaning of "initial aggressor," where the state did not ask and defendant did not object. Under the circumstances of this case, we conclude that it was.

It is plain error to fail to instruct the jury on all material elements of a crime. *State v. Gray*, 261 Or App 121, 130, 322 P3d 1094 (2014). That principle extends to important terms of art used in the elements of the crime. For example, in *State v. Chase*, 263 Or App 709, 710, 328 P3d 838 (2014), we held that it was plain error not to instruct the jury on the meaning of "enter or remain unlawfully," a statutorily defined term of art used in one of the elements of the charged crime. In *State v. Burris*, 309 Or App 604, 609-10, 483 P3d 1213, *rev den*, 368 Or 511 (2021), we held that

it was plain error not to instruct the jury on the meaning of "sexual contact," a statutorily defined term of art used in one of the elements of the charged crime.

It is also plain error to fail to instruct the jury on the elements of a defense or limitations on a defense. In *Brown*, 327 Or App at 599, we held that it was plain error for the trial court not to instruct the jury on the initial-aggressor limitation on self-defense, where the prosecutor raised that limitation during closing argument.

In this case, the court instructed the jury that the defense of self-defense is not available to the "initial aggressor," but it did not instruct on what "initial aggressor" means, despite that term having a narrower legal meaning than its common usage. It was particularly important on this record for the jury to have a correct understanding of what it means to be the "initial aggressor," because the jury heard conflicting versions of events from different witnesses, with a spectrum of scenarios ranging from defendant merely yelling at C not to beat on women, to defendant approaching C with the intention of starting a fight, to defendant stabbing C immediately upon seeing him. Without an instruction from the court as to what it means to be the "initial aggressor," a juror could reasonably—but incorrectly—conclude that defendant deciding to involve himself in the situation and yelling at C not to beat on women qualified as an initiating act of "aggression" sufficient to defeat self-defense.[4]

Any doubt about the need to instruct the jury on the meaning of "initial aggressor" ceased to exist during closing arguments. In closing argument, the prosecutor told the jury that being the "initial aggressor" did not necessarily require "physical" aggression and that it was for the jury to decide what "aggressor" means. The prosecutor also inaccurately implied that the jury could find defendant to be the initial aggressor based on defendant "injecting" himself into the situation, by approaching the scene of C and B's

---

[4] C testified to being unaware that defendant had a knife until he was stabbed. Defendant testified that he yelled out as he was leaving his tent that he had a knife, not knowing who he might encounter on the trail, but that no one responded and that it was likely that no one heard him in the commotion. No version of events was presented in which defendant brandished the knife at C or threatened C with the knife or in which C even saw the knife.

argument and yelling at C not to beat on women, instead of "minding his own business." The lack of an instruction left the jury without necessary information. The prosecutor's closing argument filled that void with misleading suggestions about what it means to be an initial aggressor—even if, as the state contends, the prosecutor did not mean to be misleading—and thus exacerbated the problem.

Under the circumstances, the state should have asked the court to instruct the jury on the meaning of "initial aggressor." *See Brown*, 327 Or App at 598-99 (when the prosecution relies on a limitation on self-defense, it is the state's obligation to request the necessary instructions on that limitation). Even absent such a request, however, the court needed to provide sufficiently complete instructions on the defense of self-defense, and the limitations on that defense, for defendant to receive a fair trial. Although "initial aggressor" is not statutorily defined, it is undisputed that it is a legal term of art as used in ORS 161.215, *see Phillips*, 313 Or App at 5, and the difference between the colloquial meaning of aggression and the legal meaning for purposes of self-defense law was directly relevant to one of the key factual questions to be decided by the jury.

As for what instruction should have been given, the parties disagree on the specific phrasing of a proper instruction on the meaning of "initial aggressor." The state contends that defendant's phrasing in his opening brief is slightly too narrow, to which defendant replies that the precise phrasing is not the point. We agree with defendant. Again, it was the state, not defendant, that should have proposed an instruction. In the end, what the court needed to convey to the jury was that the "initial aggressor" is the person who first engages in an overt act of hostility, and that "mere words" do not make a person the "initial aggressor" unless accompanied by an overt act of hostility.[5]

In sum, we agree with defendant that, on this record, it is obvious that the court needed to instruct the

---

[5] There is currently no uniform jury instruction on the meaning of "initial aggressor," although the comment to the uniform instruction on the initial-aggressor limitation notes that "'provocation by mere words' does not cause a person to become the initial aggressor unless accompanied by an 'overt act of hostility.'" Comment to UCrJI 1110 (quoting *Phillips*, 313 Or App at 6).

jury on the meaning of "initial aggressor," and failing to do so was a plain error. We also agree that the error was not harmless. As noted, the jury was presented with different versions of events—some that would make defendant the initial aggressor, and some that would not. Having reviewed the entire record, we conclude that there is more than a little likelihood that the lack of instruction on the meaning of "initial aggressor" affected the verdict.[6] *State v. Davis*, 336 Or 19, 32, 77 P3d 1111 (2003) (an error is harmless if "there was little likelihood that the error affected the jury's verdict"). Finally, this is an appropriate case in which to exercise our discretion to correct a plain error, and we are unpersuaded by the state's arguments to the contrary. Of particular importance is the gravity of the error, which may well have resulted in defendant being wrongly convicted of a Class B felony and sentenced to 70 months in prison.

Reversed and remanded.

---

[6] In reaching that conclusion, we do not consider relevant the fact that the jury saw excerpts of defendant's recorded police interview in which police detectives asserted that defendant was the "aggressor" and could not claim self-defense. The court instructed the jury not to consider those statements for truth *and* that they could "contain inaccurate statements about the law and the facts in this case." We presume that the jury followed its instructions, *Burns v. General Motors Corp.*, 133 Or App 555, 564, 891 P2d 1354 (1995), and therefore do not view that evidence as relevant to the harmlessness analysis.