Argued and submitted March 2, judgment affirmed as to defendant's conviction for aggravated murder; sentence of death vacated; case remanded to circuit court for further proceedings July 9, 1992

STATE OF OREGON,
*Respondent,*

*v.*

MICHAEL MARTIN MCDONNELL,
*Appellant.*

(CC J85-0004; SC S38177)

837 P2d 941

Stephen J. Williams, Deputy Public Defender, Salem, argued the cause and filed the brief for appellant. With him on the brief were Sally L. Avera, Public Defender, and Diane L. Alessi, Deputy Public Defender, Salem.

Brenda J Peterson, Assistant Attorney General, Salem, argued the cause and filed the brief for respondent. With her on the brief were Charles S. Crookham, Attorney General, Virginia L. Linder, Solicitor General, and Janet A. Metcalf and Robert B. Rocklin, Assistant Attorneys General, Salem.

VAN HOOMISSEN, J.

Fadeley, J., dissented and filed an opinion.

## VAN HOOMISSEN, J.

This is an automatic and direct review of a judgment of conviction of aggravated murder and sentence of death. *Former* ORS 163.150(1)(f) (1987) (now ORS 163.150(1)(g)). Defendant seeks reversal of his conviction for aggravated murder. Alternatively, he asks this court to vacate his sentence of death. We affirm defendant's conviction. We vacate his sentence of death and remand this case to the circuit court for further proceedings consistent with this opinion.

### SUMMARY OF FACTS

The jury found defendant guilty. We therefore view the evidence in the light most favorable to the state. *State v. Rose*, 311 Or 274, 276, 810 P2d 839 (1991).

In 1984, defendant was charged with the aggravated murder of Joey Keever after defendant had escaped from a state penal or correctional facility. ORS 163.095(2)(f).[1]

Defendant previously had been committed to the Oregon State Penitentiary and was received there on May 16, 1984. He was assigned to the Farm Annex on November 9 and escaped from custody on November 21. He was still an escapee on the day he killed Keever.

In 1986, the trial court set aside the indictment against defendant, concluding that ORS 163.095(2)(f) violated Article I, sections 16 and 20, of the Oregon Constitution, and the Eighth Amendment to the Constitution of the United States, because it imposed an unconstitutional sentence. The Court of Appeals reversed and remanded the case for trial, concluding that "[t]he fact that a sentencing statute authorizes imposition of an arguably unconstitutional sentence does not mean that the statute defining the crime violates any of the * * * constitutional provisions [cited by the trial

---

[1] ORS 163.095 provides in part:

"As used in ORS 163.105 and this section, 'aggravated murder' means murder as defined in ORS 163.115 which is committed under, or accompanied by, any of the following circumstances:

"(2) * * * * *

"(f) The murder was committed after the defendant had escaped from a state, county or municipal penal or correctional facility and before the defendant had been returned to the custody of the facility."

court]." *State v. McDonnell*, 84 Or App 278, 281, 733 P2d 935, *rev den* 303 Or 455 (1987).

At his trial in 1988, defendant stipulated that he caused Keever's death by cutting her with a knife. His defense was that he did so while in a drug-induced psychosis and that, while he was in that condition, he was unable to form the intent necessary to commit the crime of aggravated murder and that, therefore, he was guilty only of the crime of manslaughter.

Martin and Jennifer Thompson testified for the state that on December 22, 1984, they were driving to a livestock auction. They stopped to observe a pickup at the railroad tracks on Boswell Springs Road near Drain. They thought that the pickup had been in an accident because it was parked against the tracks. Martin Thompson left his car to investigate and saw defendant with a knife in his hand and blood on himself. Defendant told Thompson "to get the hell out of there." As Thompson returned to his car to get a gun, defendant threw Keever out of the pickup, slashed at her with the knife, and drove off at high speed.

Keever got up and ran toward the Thompsons. Her throat had been cut. The Thompsons placed Keever in their car and drove her to the Drain fire station, where a volunteer ambulance crew commenced life-saving measures. Keever was dead on arrival at the Douglas Community Hospital.

The cause of death was loss of blood, primarily due to the severing of Keever's neck vessels. Dr. Roos, who performed the autopsy, found 40 knife wounds on Keever's body, including multiple wounds to the chin, neck, hands, chest, and abdomen. Keever had eight stab wounds on her right hand and 13 on her left. Roos characterized them as "defense" wounds, which he described as occurring "where someone is grabbing for something and then it's pulled away and then it just slices through, here, there, everywhere." On the day after Keever's death, Deputy Sheriff Cannaday arrested defendant. At the time, defendant had scratches on his face and some cuts on the back of his right index and middle fingers. A criminalist testified for the state that he would not consider these cuts to be "defensive wounds," because the wounds were on the backs of defendant's fingers.

Samples of head hair, fingernails, and blood were taken from defendant. His hair matched strands of head hair found intertwined in the fingers of each of Keever's hands. Blood found on the back of defendant's pants matched Keever's blood.

After a jury trial, defendant was found guilty of aggravated murder. In a separate sentencing hearing, the jury answered in the affirmative the three questions then posed by *former* ORS 163.150(1)(b). *See post,* at 506. The trial court then entered an "order" sentencing defendant to death. ORS 163.150(5). Later, pursuant to leave granted by this court, *State v. McDonnell,* 306 Or 579, 761 P2d 921 (1988), the trial court entered a judgment of conviction and sentence of death.

This is the second time that this court has reviewed defendant's conviction and sentence. Although defendant first challenged his conviction and death sentence on several grounds, the parties agreed to limit his first review by addressing only whether the trial court had erred in denying defendant's motion to require the district attorney to offer him an opportunity to plead to the charge of aggravated murder and to receive a life sentence under *former* ORS 163.150. Defendant argued that the district attorney had abdicated his prescribed role in the plea discussion process, ORS 135.405 *et seq,* and allowed it to be usurped by the victim's parents.

In *State v. McDonnell,* 310 Or 98, 105, 794 P2d 780 (1990), this court found a statutory violation of ORS 135.415, because "the victim's parents' wishes were the controlling factor in the district attorney's decision [not to accept defendant's plea offer]." Accordingly, this court vacated the judgment and remanded the case to the trial court "for an evidentiary hearing to determine how the [district attorney] would have exercised his judgment and discretion on the basis of proper criteria and the facts that existed at the time he declined to enter into the plea agreement." *Id.* at 106. This court directed that:

"If, after hearing the evidence, the trial court finds that the district attorney would have reached the same decision to proceed with the prosecution of the accused on proper grounds, then the judgment of conviction and sentence of

death shall be reinstated and an appeal therefrom may proceed. If, however, the trial court finds that the [district attorney] would have accepted the negotiated plea, then, as the state concedes, the defendant shall be permitted to enter a plea of guilty to the crime of aggravated murder and the trial court shall sentence him to life imprisonment." *Id.* at 106-07.

On remand, the trial court found:

"Upon a review of the testimony and evidence presented, the record supports the Court finding that had the prosecutor considered the following criteria, which the Court finds to be proper, to the facts that existed at the time he decided [whether] to enter into the plea agreement, he would have proceeded with the prosecution:

"1) The emotional and mental well-being of the victim's family.

"2) Genuine legal question as to the lawfulness or unlawfulness of plea bargaining certain offenses.

"3) The reduction of the quality of evidence caused by litigation delay.

"4) The need for a strong response by the State for a particularly outrageous act against a victim and the community at large.

"5) Whether the death penalty in the state of Oregon is in actual practice, a reasonably expected result such to justify a long, arduous trial.

"6) The attempt to resolve cases that demand large amounts of court time and its impact on the effective administration of justice.

"7) The allowance of a guilty plea and/or a defendant's acceptance of responsibility for his actions and its positive impact on the rehabilitative process.

"Accordingly, *the Court finds that based on the above proper criteria, the prosecutor would have proceeded to trial in the case.*" (Emphasis added.)

We interpret the trial court's quoted findings to mean that, after hearing the evidence on remand, the court found that, had the district attorney not deferred to the wishes of the victim's family in 1986, *i.e.*, had he acted independently, after considering the appropriate criteria, he would have reached the same decision to proceed with the prosecution of the

defendant. Based on those findings, and pursuant to this court's directive in *State v. McDonnell, supra,* 310 Or at 106-07, the trial court reinstated the judgment of conviction and sentence of death previously ordered. This second automatic review proceeding was then filed in this court.

We proceed now to consider defendant's assignment alleging error on remand, as well as his other assignments of error that were not considered during our first review.

## I. PRE-TRIAL MOTIONS

### *Motion to Compel Plea Offer*

■ Defendant contends that the trial court erred on remand in denying his motion to require the district attorney to offer him an opportunity to plead to the charge of aggravated murder and to receive a life sentence under *former* ORS 163.150. He argues that the district attorney did not consider "any appropriate criteria" in deciding whether to accept defendant's plea offer "but, rather, left the decision to the victim's parents." He asks this court "to compel the [district attorney] to offer defendant the opportunity to plead to the charge and to receive a life sentence under *former* ORS 163.150." He relies primarily on Article I, section 20, of the Oregon Constitution,[2] and the Equal Protection Clause of the Fourteenth Amendment to the Constitution of the United States.[3] This court reviews whether a defendant was improperly denied a plea offer for an error of law. *State v. Farrar,* 309 Or 132, 139, 786 P2d 161 (1990).

After our first review of this issue in *State v. McDonnell, supra,* we found it necessary to remand to the trial court for an evidentiary hearing, because the record was inadequate to determine what the district attorney's decision would have been regarding defendant's plea offer, had the district attorney not placed dispositive reliance on the wishes

---

[2] Article I, section 20, provides:

"No law shall be passed granting to any citizen or class of citizens privileges, or immunities, which, upon the same terms, shall not equally belong to all citizens."

[3] The Fourteenth Amendment provides in part:

"No State shall * * * deny to any person within its jurisdiction the equal protection of the laws."

of the victim's parents. 310 Or at 106-07. The trial court, as noted, found that, even without his deference to the wishes of the victim's parents, the district attorney would have rejected defendant's plea offer. If that finding of fact is supported by evidence in the record, we are bound by it on appeal. *Ball v. Gladden*, 250 Or 485, 487, 443 P2d 621 (1968).

The record, now complete, reveals the following facts:

■ William Lasswell was the Douglas County District Attorney when Oregon voters reinstated the death penalty in 1984 and when defendant murdered Keever later that same year. At the time of this murder and at the time defense counsel proposed a plea offer to the district attorney's office, Lasswell's view was that, once a defendant was indicted for aggravated murder, plea bargaining was not permitted. At the evidentiary hearings on remand, Lasswell explained:

> "It was my understanding of the law at that time that we, as the prosecution, had to present [our] best case. Assuming we have a guilty verdict [of] aggravated murder, we had to present our best case on those three [penalty phase] issues and the jury would decide them. So I did not feel that we had discretion. In other words, I didn't assess or the office didn't assess those issues at the time of the charging [decision]."

The criminal investigation was assigned to Charles Lee, Lasswell's Chief Deputy, shortly after the murder was committed. Lasswell and Lee made the decision to charge defendant with aggravated murder. According to Lasswell,

> "[the charging decision] was a very straight-forward decision because this particular death * * * appeared to us to have been committed by someone who fell within * * * one of the [aggravated murder] categories, therefore the death penalty would be appropriate and * * * there were eye witnesses, a couple of eye witnesses to the killing, so it was a strong case. The person that allegedly did the killing fell within the — was an escapee so it was a go."

Lee intended to try the case as a death penalty case, and he communicated that decision to defense counsel. Lee testified that the policy of the Douglas County District Attorney's office concerning aggravated murder cases was that "there wouldn't be plea bargaining to life in death penalty

cases." He agreed with Lasswell's interpretation of the death penalty statutes in existence at the time.

Trial deputies in Douglas County were given considerable leeway in plea negotiations in their assigned cases, provided that they acted within the confines of the office plea bargaining policy. However, a deputy assigned to an aggravated murder case would not have been allowed to deviate from the office policy of no plea bargaining without clearing it with Lasswell or Lee. On questioning by defense counsel at the evidentiary hearing on remand, Lee explained:

> "[DEFENSE COUNSEL:] Had the case been assigned to Mrs. Champion [another trial deputy] and had her views differed with respect to the propriety of negotiating an aggravated murder case would she have been free to negotiate an aggravated murder case?

> "[LEE:] I don't think so. I think that we would have chewed on that quite a bit and if she wanted to plead it out, either she's have had to convince [Lasswell] and [me] that that was the right thing to do or we'd have switched another Deputy DA into that position to take over that case but again that's pretty theoretical."

As noted, in 1986, a few days before the trial of this case was scheduled to begin, the trial court declared unconstitutional that portion of the aggravated murder statute that punished as aggravated murder an intentional murder that was committed by one who was an escapee. The state appealed that ruling, and Lasswell felt that the appeal could delay the case at least one year. Lee was prepared to proceed to trial at the time of the trial court's ruling. No plea discussions had occurred before that date, and Lee was not interested in negotiating a life sentence plea.

Following the trial court's ruling, the defense lawyers approached Lasswell regarding a plea. The lawyers proposed that defendant would plead guilty to aggravated murder, the state would then decline to present any evidence at the penalty phase, and defendant "would accept a life sentence."[4] At the end of the meeting, Lasswell advised

---

[4] The plea discussion at issue in this case took place before the effective date of the 1987 amendment to *former* ORS 163.150. Or Laws 1987, ch 557, § 1. Under the amended statute, when a defendant pleads guilty to aggravated murder and the state advises the court that it declines to present evidence for purposes of sentencing, the

defense counsel that he would need to discuss the defense proposal with Lee and with the victim's parents.

Before that meeting with the defense lawyers, Lasswell had had a number of contacts with the victim's parents, primarily with the victim's mother. Lasswell felt that the victim's mother "was just overwhelmed with emotions involving her daughter's death." Lasswell also knew that at one time the victim's father was stalking the streets with a gun. As a result of his contacts with the victim's parents, Lasswell "was very concerned about [their] emotional health and their welfare so [he] thought it important to present to them this offer that had just [been] received."

Lasswell's assessment of the proposed plea agreement was "almost exclusively based on [his] concern for [the victim's parents'] emotional health and welfare." He was concerned that they "wouldn't make it through another year." Had the victim's parents told Lasswell that they could "not take another year," then Lasswell "would have told [Chief Deputy] Lee that it was [Lasswell's] recommendation that we accept that plea bargain." Lasswell's willingness to consider a plea "was based solely on [his] concern for the welfare [of the victim's parents]."

Although Lasswell also had a concern about the delay that would be caused by an appeal of the trial court's ruling and the potential that evidence or witnesses might become unavailable while the appeal was pending, that consideration was "a very, very minor one." He also considered the possibility that the delay might even be more prolonged because of the appellate court's unwillingness to "okay an execution." Those other considerations, however, did not have "any independent force * * * at that time." As noted, Lasswell's willingness to consider a plea "was based solely on [his] concern for the welfare [of the victim's parents]."

The victim's parents rejected the plea proposal. The victim's father "was offended" that Lasswell was considering

---

court sentences a defendant to life imprisonment without empaneling a jury. Before this change, the trial court could accept a defendant's plea to aggravated murder and impose a negotiated life sentence only by first empaneling a jury and holding a sentencing hearing at which the state declined to present any evidence to support a sentence of death.

the family's welfare. He told Lasswell that "both he and his wife wanted to go ahead with the case even though it was going to take at least another year." The position of the family was relayed to the defendant's lawyers.

Lasswell's dispositive reliance on the victim's family's wishes at that time led to our reversal and remand in *State v. McDonnell, supra.* On remand the trial court had to determine what Lasswell's decision would have been had it been based on appropriate considerations. During the remand hearing, Lasswell was asked by the court to evaluate this case in terms of the criteria set out in ORS 135.415.[5] After doing so, Lasswell testified:

> "It's obvious that if this — if that plea had of been accepted, the docket would have been cleared of that case, a month or two months, so other cases could have been tried. It is true that by an acknowledgement of guilt, it would have been acceptance of the statutory language [ORS] 135.415(2) says there would have been an acknowledgment of responsibility and that's supposed to be one of the considerations in potential rehabilitation somewhat and also some finality as far as the community in identifying a particular person as a wrongdoer. And the fact that he appeared to be, under a plea offer, to spend at least twenty years of confinement, a substantial * * * measure of safety to the community and so, you know, then we have some — a problem trial would have been

---

[5] ORS 135.415 provides:

"In determining whether to engage in plea discussions for the purpose of reaching a plea agreement, the district attorney may take into account, but is not limited to, any of the following considerations:

"(1) The defendant by the plea of the defendant has aided in insuring the prompt and certain applications of correctional measures to the defendant.

"(2) The defendant has acknowledged guilt and shown a willingness to assume responsibility for the conduct of the defendant.

"(3) The concessions made by the state will make possible alternative correctional measures which are better adapted to achieving rehabilitative, protective, deterrent or other purposes of correctional treatment, or will prevent undue harm to the defendant from the form of conviction.

"(4) The defendant had made public trial unnecessary when there are good reasons for not having the case dealt with in a public trial.

"(5) The defendant has given or offered cooperation when the cooperation has resulted or may result in the successful prosecution of other offenders engaged in equally serious or more serious criminal conduct.

"(6) The defendant by the plea of the defendant has aided in avoiding delay in the disposition of other cases and thereby has increased the probability of prompt and certain application of correctional measures to other offenders."

avoided but I thought that in spite of * * * there being these reasons why, * * * you might want to make a plea offer, that this was, an outrageous act against the community and that the people of Oregon had clearly expressed themselves how they wished their law enforcement officials, including myself, to react to this kind of situation. That the only appropriate method of proceeding was as we, Mr. Lee, had seen the situation, which I agreed was to go ahead with the death penalty. So, * * * there would have been some reasons for making a plea bargain separate from the [victim's parents'] feelings but I, * * * there was never any — there was never any question in my mind about what we should do, going ahead. The only question was that which I mentioned before was the [victim's parents'] welfare. Other things, of course, we can tack them on as being reasons if they had said * * * we can't take it anymore, and all, * * * there would have been a lot of other reasons to bolster their decision but I was really only concerned about their welfare. I probably haven't answered the question.

"Q. *I guess the Supreme Court wanted to know [what you would have done] if you didn't take into consideration their feelings. I gather from your answer you would have been — that you would have proceeded with the case?*

"A. *Absolutely.*" (Emphasis added.)

In other words, the only impact that consideration of the family's preference was going to have *was in defendant's favor*. And it was simply because the victim's parents did *not* ask for that consideration that the district attorney had no other reason not to proceed to trial. Thus, in the absence of that intervening consideration — removing it from Lasswell's decision-making process — the case would have proceeded just as it did. The trial court found that Lasswell would have considered a number of proper criteria and that, on the basis of those criteria, he would *not* have offered defendant a life sentence.

The record is clear that from the moment defendant was charged with aggravated murder, the district attorney and the chief deputy intended to seek the death penalty. At the evidentiary hearings on remand, the defense lawyers admitted that Lee never wavered in his decision to seek the death penalty. Lasswell also testified that this case was always a death penalty case until he intervened to consider the wishes of the victim's parents. Once the parents told

Lasswell that they too wished this case to proceed as a death penalty case, Lasswell told Lee to "go ahead" with the trial. Clearly, the trial court believed and accepted the testimony of Lasswell and Lee on this issue.

Defendant does not challenge the accuracy of any of the trial court's findings on remand. Those findings are supported by evidence in the record and are dispositive of this issue. *Ball v. Gladden, supra*, 250 Or at 489. We find no state or federal constitutional violation and no error.

### *Permissibility of Denial of Plea Offer*

Defendant next attacks the district attorney's decision to deny the plea offer on the ground that it "was purely haphazard and not a part of a coherent, systematic policy." According to defendant, the decision was haphazard for two reasons: "There were no particular standards concerning when a plea bargain should be offered in any given case" and "[t]he decision whether to extend a plea offer was left up to each individual deputy." According to defendant, the district attorney

"candidly admitted that his overriding concern was the emotional health and welfare of the victim's parents. He did not have a systematic policy concerning plea bargains, but left the decision to his deputies on an individual basis. This is precisely the type of *ad hoc* decision making condemned in *State v. Freeland*, [295 Or 367, 667 P2d 509 (1983)]."

Defendant misreads the record. Both Lasswell and Lee testified that at the time defendant proposed his plea offer the policy of the office was that there would be no plea bargaining once a defendant was charged with aggravated murder. Lee and Lasswell made the decision to charge defendant with aggravated murder because the facts of the case fit one of the aggravated murder categories — murder after escaping — and because the facts of the case were strong. The factors on which the prosecutors relied in charging defendant with aggravated murder were permissible. *See State v. Farrar, supra*, 309 Or at 137-38 (probable cause to believe that the defendant committed the crime of aggravated murder is a sufficient reason to charge that crime).

The prosecution's "no-plea-bargaining" policy was based at least in part on both Lee's and Lasswell's interpretation that, under *former* ORS 163.150, it was impermissible to plea bargain in capital murder cases. Lee testified that when

"this [case] happened we had decided *as a policy* that we would not be plea bargaining capital murder cases and that [policy] was based upon the statutory scheme itself which set out what seemed to us to be a pretty limited category of offenses that fit capital murder upon decision that the people's legislative will that those should be capital murder cases and upon a judgment that within the office we did not feel that trading the threat of killing somebody for a guilty plea was an appropriate tactic for the prosecutor's office to be using. It seems to me *we did a lot of thinking about what our policy would be in death penalty cases* though this came up pretty quickly after the law took effect."[6] (Emphasis added.)

Generally, a decision by the district attorney whether or not to engage in plea negotiations is subject to judicial scrutiny. *State v. Buchholz*, 309 Or 442, 446, 788 P2d 998 (1990); *State v. Farrar, supra*, 309 Or at 139; *State v. Freeland, supra*, 295 Or at 370. In deciding whether to offer a plea bargain to a defendant, a district attorney must exercise discretion in a manner that adheres to sufficiently consistent standards to represent a coherent, systematic policy. *State v. Freeland, supra*, 295 Or at 375. A rational no-plea-bargaining policy, consistently applied, is permissible. *Id.* at 376-77.

Here, the decision not to plea bargain in aggravated murder cases was based on rational and proper grounds, including a "[g]enuine legal question as to the lawfulness or unlawfulness of bargaining certain offenses." Defendant's contention that each of Lasswell's deputies made his or her own plea bargaining policy is not supported by the record, at least with respect to death penalty cases.

In *State v. Buchholz, supra*, 309 Or at 447, this court held that "[t]he standards expressed in ORS 135.415 are

---

[6] The 1984 death penalty statute, proposed by initiative petition as Ballot Measure 7, was enacted by a vote of the people at a general election on November 6, 1984, and became effective December 6, 1984. *State v. Wagner*, 305 Or 115, 117 n 2, 752 P2d 1136 (1988), *vacated and remanded on other grounds* 492 US 914, 109 S Ct 3235, 106 L Ed 2d 583 (1989). This case was the first aggravated murder prosecution in Douglas County under the 1984 statute.

consistent standards representing a coherent, systematic policy" for purposes of exercising prosecutorial discretion in plea bargaining. Defendant asserts that in this case the district attorney did not comply with those statutory standards.

■ The list of reasons in ORS 135.415, *see supra* note 5, is non-exclusive. *State v. McDonnell, supra,* 310 Or at 105. The statute provides that "the district attorney *may* take into account, *but is not limited to"* the statutory considerations. (Emphasis added.) "[Victims of crimes and their families] potentially play an important role in the plea negotiation process. District attorneys legitimately may consult with them." *Id.* The district attorney, however, may not permit victims or their families to control the plea agreement decision. *Id.* at 106. We conclude that the Douglas County District Attorney's no-plea-bargaining policy in aggravated murder cases does not violate that statute. In any event, on remand, Lasswell analyzed this case in terms of the factors listed in the statute and concluded that defendant would not have been offered a life sentence. As noted, the trial court believed him, and the record supports that finding.

■ In light of the record on remand, we conclude that the district attorney's decision not to enter into a plea bargain was constitutionally permissible. Defendant, therefore, has not established a factual predicate for asserting any alleged violation of Article I, section 20, of the Oregon Constitution. *See State v. Walton,* 311 Or 223, 251-52, 809 P2d 81 (1991) (defendant did not attempt to show that the district attorney's decision to seek aggravated murder indictment was prompted by any improper motive or reason); *State v. Farrar, supra,* 309 Or at 140 (district attorney's actions were not haphazard, "not based on class discrimination, animus to defendant or to his attorney, or on concerns collateral to fair prosecution"); *State v. Montez,* 309 Or 564, 606, 789 P2d 1352 (1990) (same).

For the same reasons, we conclude that defendant has not shown any violation of the Equal Protection Clause of the Fourteenth Amendment to the federal constitution. *See State v. Freeland, supra,* 295 Or at 370 ("the clauses are sufficiently similar that compliance with Article I, section 20 usually will also satisfy the 14th amendment"); *State v. Clark,* 291 Or 231, 243, 630 P2d 810, *cert den* 454 US 1084

(1981) ("for most purposes analysis under Article I, section 20 and under the federal equal protection clause will coincide").

*Comparative Review of Plea Agreements*

■ Defendant argues that this court should determine whether he was unfairly denied a plea offer when his situation is compared to that of other defendants charged with aggravated murder throughout the state. He asserts that ORS 163.150(1)(g) should be interpreted to require statewide "proportionality review." This court recently has rejected an identical contention related to comparative sentence review. *State v. Montez, supra,* 309 Or at 607; *State v. Wagner,* 305 Or 115, 169-71, 752 P2d 1136 (1988), *vacated and remanded on other grounds* 492 US 914, 109 S Ct 3235, 106 L Ed 2d 583 (1989). We decline defendant's invitation to attempt to inquire into the proportionality — if that is the correct word — in the availability of plea bargaining, for the same reasons expressed in our recent cases discussing proportionality review of sentences.

Defendant also relies on the Equal Protection Clause of the Fourteenth Amendment to the Constitution of the United States. In *State v. Farrar, supra,* 309 Or at 140, we concluded that under Article I, section 20, of the Oregon Constitution, "the appropriate persons for the analysis of disparate treatment are those who have been charged in [the same county] with aggravated murder[.]" Defendant makes no separate argument as to why the result would be any different under the Fourteenth Amendment. *See State v. Freeland, supra,* 295 Or at 370 (for most purposes, state and federal equal protection analysis will coincide); *State v. Clark, supra,* 291 Or at 243 (same). Defendant does not argue that any other defendant charged with aggravated murder in Douglas County received preferential treatment in plea discussions.

■ Moreover, even were we inclined to review for such proportionality, no adequate record exists here for such a review. Defendant argues that, if his case is compared to those of other defendants throughout the state who faced the death penalty, it will be "apparent" that he was unfairly denied a plea offer. However, the extent of the record here is a

list of the status of aggravated murder/death penalty cases compiled by the State Court Administrator's Office in June 1989. Defendant does not explain how this court is to compare his case with the cases of the other defendants on that list merely by looking at a list of names and dispositions. Defendant bears the burden of showing disparate treatment. *See City of Salem v. Bruner*, 299 Or 262, 271, 702 P2d 70 (1985) (defendant must show how the choice of procedure was administered and that the choice was a purely haphazard one); *State v. Clark, supra*, 291 Or at 243 (the defendant must make showing). Defendant has not met that burden.

### Motion to Act As Co-Counsel

Defendant contends that the trial court erred in refusing to allow him to participate in the trial proceedings as co-counsel. He argues that he has a constitutional right to act as co-counsel. At trial, he relied exclusively on Article I, section 11, of the Oregon Constitution.[7]

In the trial court, defense counsel's written motion asserted that "[d]efendant wishes to have the option to participate fully in his defense." Later, during *voir dire*, defense counsel again advised the trial court that defendant's motion was a request to have him "participate fully" as co-counsel throughout the trial. According to defense counsel, defendant "would be subject to the [same] rules as counsel are and subject to the discipline of the Court as he is anyway and if that there's [*sic*] no cause to believe that there would be any disruption or any problem."

The district attorney objected, arguing that, "because of the increased risk of error, of mistrial, of all sorts of problems created from letting someone who is not learned in the law act as a lawyer," defendant's motion should be denied. He argued further that,

"because to the extent that the defendant stands a chance of being convicted and eventually executed, he personally has no real stake in seeing the trial come to a proper end. He has no reason to follow the Court's rules because a mistrial

---

[7] Article I, section 11, provides in part:

"In all criminal prosecutions, the accused shall have the right * * * to be heard by himself and counsel."

[based on defendant's misconduct would] hardly be a sanction against him even if he did know the proper rules."

The district attorney disagreed with defense counsel's assertion, that defendant would be subject to the same discipline as the lawyers, arguing that "the defendant can't be disbarred, [and] it would take something very drastic on his part to cause him to be removed from the courtroom, he can hardly be suspended from the practice of law or fined if he misbehaved." Finally, the district attorney reminded the court that defendant had three defense lawyers representing him.

■ In *State v. Stevens*, 311 Or 119, 123-25, 806 P2d 92 (1991), this court held that a defendant has no state constitutional right to "hybrid" representation. Under a hybrid form of representation, defendant and counsel act, in effect, as co-counsel, with each speaking for the defense during different phases of the trial. *See* 2 LaFave and Israel, Criminal Procedure 51, § 11.5(f) (1984) (although raised in a substantial number of cases, this contention has failed to persuade either federal or state courts). Having rejected in *Stevens* the same constitutional argument advanced by defendant here, we hold that the trial court did not err in rejecting defendant's argument that he had a state constitutional right to act as co-counsel, *i.e.*, to have hybrid representation.[8]

■ As this court noted in *Stevens*, however, a trial court has discretion to allow, as well as to deny, hybrid representation. 311 Or at 124-25. In this case, in the alternative to his constitutional argument, defendant contends that the trial court abused its discretion in denying his motion seeking such representation.

■ In denying defendant's motion, the trial court explained:

"This is, of course, a capital punishment case, and it is argued that the defendant should be allowed to participate to the fullest extent possible. Yet, it is the very nature of the case that dictates that the potential for error be minimized.

---

[8] In *McKaskle v. Wiggiens*, 465 US 168, 183-84, 104 S Ct 944, 79 L Ed 2d 122, *reh'g den* 465 US 1112 (1984), the Supreme Court of the United States held that the Sixth Amendment right to self-representation did not extend to "hybrid" representation.

"Allowing this request would, based upon the Court's experience, invite error; the defendant's position will be adequately expressed through the efforts of co-counsel."

Those reasons are cogent. Thus, reviewing for an abuse of discretion, we hold that the trial court did not err in denying defendant's motion.

## II. GUILT PHASE

### Instructions

Defendant contends that the trial court erred in refusing to give two jury instructions that he requested, one defining the term "conscious" and one regarding the effect of "weaker and less satisfactory evidence."

Each of defendant's contentions will be addressed in turn. Before doing so, however, we note two broad considerations that apply to those contentions and that guide us in evaluating their efficacy. First, generally, a trial court "must choose those instructions which apply to each case and reject those which are merely abstract or hypothetical." *Ireland v. Mitchell*, 226 Or 286, 292, 359 P2d 894 (1961). Second, when we review a trial court's decisions in its choice of instructions, we normally will look only for any abuse of discretion. *Ibid.*

### Proposed Instruction Defining "Conscious"

Defendant contends that the trial court erred in refusing to give his requested instruction defining the word "conscious." He argues that, because his defense centered on whether his conduct was due to a drug-induced psychosis and that he therefore lacked the requisite intent to commit aggravated murder, a definition of the term "conscious" was important. He also argues that a court-supplied definition was necessary to avoid confusion and speculation on the part of the jury.

Defendant requested that the jury be instructed:

" 'Conscious' means perceiving, apprehending, or noticing with a degree of controlled thought or observation; capable of or marked by thought, will, design, or perception; or done or acting with critical awareness. Authority: Webster's New Collegiate Dictionary."

He requested that instruction as clarification of two other instructions, which the court did give to the jury, containing the word "conscious." The two instructions given stated:

"A person acts 'intentionally' or 'with intent' when that person acts with a *conscious* objective either (1) to cause a particular result; or (2) to engage in particular conduct." (ORS 161.085(7)) (emphasis added).

" 'Voluntary act' means a bodily movement performed *consciously* and includes the *conscious* possession or control of property." (ORS 161.085(2)) (emphasis added).

 Generally, words of common usage need not be defined for the jury. *State v. Nefstad*, 309 Or 523, 539-40, 789 P2d 1326 (1990); *State v. Nichols*, 236 Or 521, 535, 388 P2d 739 (1964). In the context of this case, we believe that the term "conscious" is a word of common usage and that it was understandable without elaboration. The trial court did not err in refusing to give defendant's requested instruction. *See State v. Montez, supra*, 309 Or at 600-01 (defendant's requested instruction added nothing).

*"Less Satisfactory Evidence" Instruction*

Defendant contends that the trial court erred in failing to give his requested jury instruction on "weaker and less satisfactory evidence."

In part, ORS 10.095 provides that, "on all proper occasions," the jury is to be instructed:

"(7) That evidence is to be estimated, not only by its own intrinsic weight, but also according to the evidence which it is in the power of one side to produce and of the other to contradict; and, therefore,

"(8) That if weaker and less satisfactory evidence is offered when it appears that stronger and more satisfactory was within the power of the party, the evidence offered should be viewed with distrust."

 Defendant requested that the jury be instructed:

"When you evaluate the evidence, you may consider the power of the prosecution to gather and produce evidence. If the evidence offered by the prosecution was weaker and less satisfactory evidence than other stronger or more satisfactory evidence which the prosecution could have offered, then

you should view the weaker and less satisfactory evidence with distrust."[9]

Although defendant testified at his trial, his requested instruction limited application of the principle to evidence submitted by the state. The trial court declined to give defendant's requested instruction.

Defendant argues:

"The record shows that the state could have offered stronger evidence that its investigators were unable to find defendant's clothing and the knife abandoned in the woods, and that the victim did or did not use marijuana. The state's evidence showed that a limited search of the area where defendant was found was made, rather than a thorough attempt to find the missing items. The state argued that as a result of not finding the items, it could be inferred that defendant's testimony was not credible.

"In addition, most of the witnesses whom defendant called to testify about Keever's drug use were reluctant to do so and had less recall upon taking the stand than when being interviewed by the defense investigator. There was evidence available to the state regarding Keever's drug use.

"Under these circumstances, the trial court erred in refusing to give the instruction upon defendant's request."

The state notes, correctly, that defendant cites to no place in the record where the district attorney made any argument at trial "that as a result of not finding the items, it could be inferred that defendant's testimony was not credible."

The state argues that nothing in the record suggests that it had any evidence that it did not offer concerning the search for the murder weapon and defendant's clothing, or that the state could have obtained additional evidence and simply failed to do so. The state argues further that, although

---

[9] Uniform Criminal Jury Instruction No. 1025 reads:

"When you evaluate the evidence, you may consider the power of the state to gather and produce evidence. If the evidence offered by the state was weaker and less satisfactory than other stronger or more satisfactory evidence which the state could have offered, then you should view the weaker and less satisfactory evidence with distrust."

For the reasons explained in this opinion, that instruction should rarely be given in a criminal case.

it was aware of defendant's assertion at trial that the victim had used various drugs before her death, it was not incumbent on the state to offer evidence of such use, which the state did not dispute, and which use defendant argued at length to the jury.

In *State v. Mains*, 295 Or 640, 647-48, 669 P2d 1112 (1983), this court stated:

> "This case gives us an opportunity to reiterate in plain and certain terms that the 'weaker and less satisfactory evidence' instruction, ORS 10.095(7) and (8), should not be given in a criminal case whether or not the defendant takes the stand, except in those rare instances where because of an asserted defense the defendant has the burden of proof on an issue in the case. For example, when a defendant elects to attempt to evade responsibility for his conduct because of mental disease or defect, ORS 161.295, the defendant has the burden of proof on that issue. Unless such a defense has been asserted by the defendant the 'weaker and less satisfactory evidence' instruction may not be given. We believe such a rule will prevent further confusion about this instruction, provide appropriate guidance to trial courts and avoid unnecessary appeals." (Footnote omitted.)

In a footnote (and without analysis) that opinion added: "Of course, it is proper to give the statutory instruction if specifically requested by the defense[.]" *Id.* at 648 n 5. Relying on that footnote, defendant asserts that, because he requested the instruction, the trial court erred in refusing to give it. For the reasons that follow, we disagree.

We did not mean to suggest in *State v. Mains, supra,* that a trial court must give the instruction any time it is requested by the defense. On the contrary, the instruction should rarely be given. *See State v. Mains, supra,* 295 Or at 647-48 (unless, because of an asserted affirmative defense the defendant has the burden of proof on an issue in the case, the instruction should not be given). The instruction is perhaps as close to a comment on the evidence as any presently allowed and it is not appropriate in most cases. *See* ORCP 59E ("The judge shall not instruct with respect to matters of fact, nor comment thereon"), made applicable to trial of criminal actions by ORS 136.230.

Moreover, with the advent of reciprocal discovery, ORS 135.805 *et seq*; the requirement that, if the state has knowledge of evidence favorable to the defense or exculpatory in nature, the state is under an affirmative due process obligation to make it available to the defense, *Brady v. Maryland*, 373 US 83, 83 S Ct 1194, 10 L Ed 2d 215 (1963); *State ex rel Dooley v. Connall*, 257 Or 94, 475 P2d 582 (1970); and the availability of *subpoena duces tecum*, the necessity for the instruction will be rare in a criminal case. *See State v. Brewer*, 505 A2d 774, 777 (Me 1985) (in a criminal case, the failure of a party to call a witness does not permit the opposing party to argue, or the factfinder to draw, any inference as to whether the witness' testimony would be favorable or unfavorable to either party). Generally, the defendant will have knowledge of and access to the same evidence as the state. Evidence, therefore, normally is equally available to both parties. *See* 2 McCormick on Evidence 184-89, § 264 (4th ed 1992) ("A number of factors support a conservative approach [to instructing on an adverse inference]"); 2 Wigmore, Evidence § 285 (Chadbourn rev. 1979) (failure to produce evidence, as indicating unfavorable tenor of evidence).

 The trial judge has discretion to refuse the statutory instruction, and it is an abuse of discretion only if the evidence in the case makes the instruction appropriate. *Ireland v. Mitchell, supra*, 226 Or at 292. The party requesting the instruction must show, and the court must find, that other evidence was reasonably available on a fact in issue and that there is a basis for the jury to conclude that the other evidence is stronger and more satisfactory than the evidence offered. *See, e.g., Fitze v. American Hawaiian SS. Co.*, 167 Or 439, 444-47, 117 P2d 825 (1941) (applying the principle). In *Ireland v. Michell, supra*, this court held that it is reversible error to refuse to give a statutory instruction upon timely request "when there is a basis in the evidence for giving it." 266 Or at 291. In *Ireland*, however, the court explained that it is not reversible error in every case to fail to give a statutory instruction, merely because it has been requested. "There must be a proper occasion." *Id.*

In the first instance, the trial judge must decide what is a "proper occasion." On appeal, the appellate court must review the evidence and try to recapture, as much as is

possible, the atmosphere of the trial which guided the trial judge's ruling. *Id.* at 292.

We find persuasive several Court of Appeals decisions concerning the giving of the "less satisfactory evidence" instruction.

In *State v. McNassar*, 77 Or App 215, 712 P2d 170, *rev den* 300 Or 704 (1986), the defendant was convicted of driving under the influence of intoxicants and reckless driving. On appeal, he assigned as error the trial court's refusal to give a "less satisfactory evidence" instruction. In rejecting that contention, the Court of Appeals explained:

> "The instruction does not penalize a party for failing to produce all *available* evidence. Rather, it draws the jury's attention to a party's failure to produce evidence *when that failure could give rise to an inference that the evidence would be adverse to the party* — that is, when it appears that the party may be trying to hide something." 77 Or App at 218 (emphasis in original).

In *State v. Sellers*, 76 Or App 552, 709 P2d 768 (1985), *rev den* 300 Or 478 (1986), the defendant was convicted of unauthorized use of a vehicle. On appeal, he assigned as error the trial court's refusal to give a "less satisfactory evidence" instruction. The Court of Appeals held that the court's refusal to give the instruction was not error, "because the record does not indicate that the state had and failed to produce stronger evidence." 77 Or App at 555.

In *State v. Woodfield*, 62 Or App 69, 659 P2d 1006, *rev den* 295 Or 259 (1983), the defendant was convicted of murder, attempted murder and two counts of first degree sodomy. On appeal, he assigned as error the trial court's refusal to give a "less satisfactory evidence" instruction. In rejecting that contention, the Court of Appeals explained:

> "Defendant's request for this instruction was based on the fact that the state called two 'prestigious experts' to testify concerning tests of the bullets found in defendant's house and at the scene and a pubic hair found at the scene. They described the tests and testified that those tests were generally accepted in the scientific community. They did not themselves, however, conduct tests on the exhibits in this case; employes of the State Police crime laboratory had

performed the actual tests on the physical evidence. Defendant would treat their testimony as 'less satisfactory evidence,' because those employes had considerably less experience in conducting the tests than the 'prestigious experts' called by the state.

"\* \* \* \* \*

"The only indication in this record is that the state did *not* have any evidence that was not offered. The 'prestigious experts' testified that they had not conducted analysis of the bullets or the hair. There is no contention that the experts who did conduct the tests were not qualified to do so. There was no error in the court's refusal to give the instruction." 62 Or App at 73-74 (emphasis in original).

In *State v. Brock*, 53 Or App 785, 633 P2d 805 (1981), *aff'd* 294 Or 15, 653 P2d 543 (1982), the defendant was convicted of theft in the first degree. On appeal, he assigned as error the trial court's failure to instruct on "less satisfactory evidence." The Court of Appeals stated:

"When a defendant in a criminal case requests such an instruction, it ought to be given if otherwise appropriate. To be appropriate, there must be evidence to support the instruction. If there is no basis in the record to conclude [that] the state had evidence not produced which was arguably stronger than the proof offered, then it is not error to refuse the instruction." 53 Or App at 790.

Because there was not a sufficient basis in the evidence to support it, the court concluded that the instruction was not appropriate. *Id.* at 791.

Finally, in *Whaley v. Russell Stover*, 44 Or App 541, 606 P2d 667 (1980), an action for damages arising out of an automobile collision, the defendants assigned as error on appeal the refusal of the trial court to give a "less satisfactory evidence" instruction. The Court of Appeals rejected their contention, stating:

"Four doctors were called as witnesses, three by plaintiff and one by defendants. The fact that other witnesses are available and could give competent testimony regarding the issues at trial does not establish that the evidence offered is weaker and less satisfactory. The record establishes little more than that the opinions of the two doctors not called as witnesses would have been cumulative of the opinion of Dr. Schwerzler. The trial court, having heard the evidence and

having an appreciation of the atmosphere of the trial, concluded the instruction was not appropriate." 44 Or App at 544-45.

In sum, in a criminal case, the statutory "less satisfactory evidence" instruction, ORS 10.095(7) and (8), should rarely be given. It may, however, be appropriate "where because of an asserted affirmative defense the defendant has the burden of proof on an issue in the case." *State v. Mains, supra,* 295 Or at 657-58. Moreover, it may be appropriate in a criminal case where the state's failure to produce evidence could give rise to an inference that the evidence would be adverse to the state — that is, when it appears that the state may be trying to hide something, *State v. McNassar, supra,* 77 Or App at 218, or in a case where the record indicates that the state possessed and failed to produce stronger evidence, *State v. Sellers, supra,* 76 Or App at 555. In such a case, however, the instruction may be given only *if there is evidence in the record to support it. State v. Brock, supra,* 53 Or App at 790. Generally, the instruction need not be given where the other evidence would be merely cumulative. *See State v. McNassar, supra,* 77 Or App at 218 ("If the other evidence were favorable to the state, it would most likely be [repetitious]"); *Whaley v. Russell Stover, supra,* 44 Or App at 545 ("the record established little more than that the [evidence] would have been cumulative[.]").

In this case, nothing in the record suggests that the state had any other evidence that it did not offer concerning the search for the murder weapon or defendant's clothing, or that the state could have obtained additional admissible evidence and simply failed to do so. The record therefore does not support the giving of the requested instruction.[10] We find no error.

### Judgment of Murder

Defendant next contends that the trial court erred in denying his motion for a judgment of murder. Specifically, he challenges, in various particulars, the constitutionality of

---

[10] Moreover, nothing precluded defense counsel from arguing to the jury that, because the state allegedly offered less satisfactory evidence at trial, it failed to sustain its burden to prove defendant guilty beyond a reasonable doubt. Our review of the record, however, indicates that counsel did not argue the principle of less satisfactory evidence in his summation to the jury.

ORS 163.095(2)(f), which defines the crime of aggravated murder after escaping, and ORS 163.105, which dictates the penalty for a person found guilty of aggravated murder.[11] He argues that, because he was indicted for a single count of aggravated murder under ORS 163.095(2)(f) and sentenced for a violation of that statute under ORS 163.105, and because those statutes are unconstitutional, this case should be remanded to the trial court to vacate his judgment and sentence and to impose a judgment and sentence for the lesser included crime of intentional murder.

Defendant argues, among other things, that ORS 163.095(2)(f) and ORS 163.105 violate Article I, section 16,[12] of the Oregon Constitution, because they impermissibly impose a penalty so disproportionate to the offense committed as to shock the moral sense of all reasonable men as to what is right and proper; that those statutes violate Article I, section 20, of the Oregon Constitution, because persons who murder while escaping are impermissibly treated differently than those who murder after they have completed their escape; and that those statutes are unconstitutionally vague in violation of Article I, sections 10 and 21, of the Oregon constitution and the Due Process Clause of the Fourteenth Amendment to the Constitution of the United States. All of those contentions have been addressed and rejected in *State v. Isom*, 313 Or 391, 397-402, 837 P2d 491 (1992).

Defendant also argues that ORS 163.095(2)(f) and ORS 163.105 violate the Eighth Amendment to the United

---

[11] In 1986, as noted, the trial court held that ORS 163.095(2)(f) was unconstitutional under Article I, sections 16 and 20, of the Oregon Constitution and the Eighth and Fourteenth Amendments to the United States Constitution. The Court of Appeals, however, reversed, stating that, although it may be that *"imposing* the death penalty (or life imprisonment with a 30-year minimum) on a defendant convicted under ORS 163.095(2)(f) violates one or more of the above constitutional provisions, ORS 163.095(2)(f) does not *impose any* penalty; it merely defines a crime." *State v. McDonnell*, 84 Or App 278, 280-81, 733 P2d 935, *rev den* 303 Or 455 (1987). The court held that, because the sentencing statute, ORS 163.105, only provides for the arguably unconstitutional sentence after conviction and the defendant had not at that time been convicted, the trial court's dismissal of the indictment for aggravated murder was premature. *Id.* at 281. While the statements of the Court of Appeals may or may not be correct, in this review defendant has now been convicted, and he properly raised his constitutional challenges after his conviction.

[12] Article I, section 16, provides in part:

"Cruel and unusual punishments shall not be inflicted, but all penalties shall be proportioned to the offense."

States Constitution, "because there is no genuine narrowing of the class of persons eligible for the death penalty and no scheme reasonably justifying the imposition of a more severe sentence on one person compared to those found guilty of murder." That argument was expressly left open in *State v. Isom, supra,* 313 Or at 398 n 10.

In *State v. Farrar, supra,* this court stated:

"An aggravating factor or a category of aggravated murder is vague in violation of the Eighth Amendment if it does not genuinely narrow the class of persons eligible for the death penalty. *See Maynard v. Cartwright,* 486 US 356, 108 S Ct 1853, 100 L Ed 2d 372 (1988); *Godfrey v. Georgia,* 446 US 420, 100 S Ct 1759, 64 L Ed 2d 398 (1980), *cert den* 456 US 919 (1982) (plurality). *Godfrey v. Georgia* illustrates the Eighth Amendment concern. In that case, the jury had found, as an aggravating factor, that the murder was 'outrageously or wantonly vile, horrible and inhuman.' The plurality in *Godfrey* reasoned, however, that because almost all murders could be characterized in this way, this aggravating factor did not provide any 'principled way to distinguish in this case, in which the death penalty was imposed, from the many cases in which it was not.' *Id.,* 446 US at 433. Accordingly, it held that the factor was vague in violation of the Eighth Amendment." 309 Or at 184

*Farrar* held that ORS 163.095(2)(d) and (2)(e), which define, respectively, aggravated murder in the course of and in furtherance of a felony and aggravated murder by concealment, did not violate the Eighth Amendment. 309 Or at 184-85. In evaluating their validity, the question to be asked, the court held, is "whether the category at issue impermissibly could be applied to almost all murders." *Id.* at 185. Those statutes specified a discrete class of criminal conduct and thereby genuinely narrowed the class of persons eligible for the death penalty in compliance with the Eighth Amendment. *Ibid.*

The principles articulated in *Farrar* are dispositive in this case. The question is not whether aggravated murder after escaping is broader than aggravated felony murder for escape in the first degree, or whether there is overlap among subsections, or whether the particular subsection at issue in this case is broader than defendant would like it to be. Rather, the question is "whether the category at issue impermissibly

could be applied to almost all murders." *Id.* at 185. Clearly, the answer to that question is "no." ORS 163.095(2)(f), the provision defining aggravated murder after escaping, describes a discrete class of criminal conduct. That category could not, by any means, be applicable to almost all murders. We hold, therefore, that ORS 163.150(2)(f) genuinely and clearly narrows the class of persons who are eligible for the death penalty and does not violate the Eighth Amendment. *State v. Farrar, supra.* Accordingly, the trial court did not err in denying defendant's motion for entry of a judgment of murder.

## III. PENALTY PHASE

### *Mitigating Evidence*

■ Defendant contends that the trial court erred in refusing to give his requested penalty phase instructions on mitigating evidence. The state concedes, and we agree, that the trial court's instructions were inadequate to comply with this court's opinion in *State v. Wagner*, 309 Or 5, 14-20, 786 P2d 93, *cert den* ___ US ___, 111 S Ct 212, 112 L Ed 2d 171 (1990) (*Wagner II*), which was decided after the trial in this case. *See State v. Pinnell*, 311 Or 98, 117-18 n 30, 806 P2d 110 (1991) (setting forth the development in Oregon of the "fourth question"); *State v. Isom, supra*, 313 Or at 411 ("mitigating evidence" instructions held adequate under state and federal constitutions). Accordingly, we vacate defendant's death sentence and remand this case to the circuit court for further proceedings consistent with this opinion.

## CONCLUSION

We have considered each of defendant's guilt and penalty phase assignments of error and every argument made in support thereof. Any assignment or argument not discussed in this opinion has been considered previously and resolved against defendant, is not well taken, or is unlikely to recur on remand. We find no error as to the guilt phase of defendant's trial. We find error as to the penalty phase of his trial and reverse as to the penalty phase only.

The judgment is affirmed as to defendant's conviction for aggravated murder. The sentence of death is vacated.

The case is remanded to the circuit court for further proceedings consistent with this opinion.

**FADELEY, J.,** dissenting.

I dissent from the remand for retrial of a portion of this case for the reasons stated in the dissenting portion of my separate opinion entered when this case was previously before this court over two years ago, *State v. McDonnell*, 310 Or 98, 106, 118, 794 P2d 780 (1990). The plea bargain, which called for a sentence to imprisonment for life,[1] should be enforced. No further expense or additional jury trial or other proceeding is needed to determine whether life or death is to be chosen as the penalty.

Additional recent cases that support the result of enforcing the plea bargain, as I urge, include *U.S. v. Canada*, 960 F2d 263, 268 (1st Cir 1992); *U.S. v. Goroza*, 941 F2d 905 (9th Cir 1991), and *People v. Walker*, 54 Cal 3d 1013, 1 Cal Rptr 2d 902, 819 P2d 861, 869 (1991).

I also dissent from the majority's remand for a new penalty-phase trial for the reason stated in the first three paragraphs of my dissenting opinion in *State v. Williams*, 313 Or 19, 44-45, 828 P2d 1006 (1992).

---

[1] At the time of defendant's motion to enforce the plea bargain (deleting the illegal condition, discussed in my original dissent), ORS 163.150(2) provided that "[w]hen the defendant is found guilty of aggravated murder upon a plea of guilty * * * and * * * the state declines to present evidence for purposes of sentencing, * * * the court shall sentence the defendant to life imprisonment as prescribed by ORS 163.105."